174 P.3d 1142 (2007)
162 Wash.2d 284
WASHINGTON STATE FARM BUREAU FEDERATION; Washington State Grange; National Federation of Independent Business; Building Industry Association of Washington; Evergreen Freedom Foundation; Washington Association of Realtors®; and Steve Neighbors, Respondents,
v.
Christine GREGOIRE, governor of the state of Washington; State Expenditure Limit Committee, an agency of the state of Washington; and state of Washington, Petitioners.
No. 78637-2.
Supreme Court of Washington, En Banc.
Argued November 28, 2006.
Decided November 21, 2007.
*1144 Richard M. Stephens, Samuel A. Rodabough, Brian Donald Amsbary, Groen Stephens & Klinge LLP, Diana M. Kirchheim, Pacific Legal Foundation, Bellevue, WA, for Respondents.
Jeffrey Todd Even, Maureen A. Hart, Office of The Attorney General, Olympia, WA, for Petitioners.
Tracy N. LeRoy, Baker Botts LLP, Houston, TX, Michele G. Radosevich, Davis Wright Tremaine LLP, Seattle, WA, for Amici Curiae Washington Coalition for Open Government and American Legislative Exchange Council.
Kristopher Ian Tefft, Association of Washington Business, Olympia, WA, for Amicus Curiae Association of Washington Business.
Narda D. Pierce, Benedict Garratt Pond & Pierce, PLLC, Olympia, WA, for Amicus Curiae Gary Locke.
Michele G. Radosevich, Davis Wright Tremaine LLP, Seattle, WA, Steven Huefner, Moritz College of Law, Columbus, OH, Peter Wattson, Minnesota Senate Counsel, St. Paul, MN, for Amicus Curiae National Conference of State Ligislatures.
Margarita V. Latsinova, Jason W. Crowell, Stoel Rives LLP, Seattle, WA, for Amicus Curiae National Governors Association.
Hugh Davidson Spitzer, Foster Pepper PLLC, Seattle, WA, for Amici Curiae Washington Education Association, Washington Federation of State Employees AFL-CIO and Washington State Labor Council.
FAIRHURST, J.
¶ 1 The Washington State Farm Bureau Federation[1] (WSFB) challenges certain taxes enacted by Engrossed Substitute House Bill (ESHB) 2314.[2] WSFB claims that these taxes raise revenues in excess of the fiscal year 2006 state expenditure limit and, therefore, pursuant to the Taxpayer Protection Act (TPA), are ineffective until approved by the voters. Chapter 43.135 RCW. WSFB further argues that Engrossed Substitute Senate Bill (ESSB) 6896,[3] section 7(6), which amended the TPA's process for calculating the state expenditure limit, was not effective in establishing the fiscal year 2006 expenditure limit at a level greater than the ESHB 2314 tax revenue increase. We disagree.
*1145 ¶ 2 It is a fundamental principle of our system of government that the legislature has plenary power to enact laws, except as limited by our state and federal constitutions. Each duly elected legislature is fully vested with this plenary power.[4] No legislature can enact a statute that prevents a future legislature from exercising its law-making power.[5] That which a prior legislature has enacted, the current legislature can amend or repeal. Like all previous legislatures, it is limited only by the constitutions. To reason otherwise would elevate enactments of prior legislatures to constitutional status and reduce the current legislature to a second-class representative of the people.
¶ 3 What is true of statutes enacted by the legislature is likewise true of initiatives, for when the people pass an initiative, they exercise legislative power that is coextensive with that of the legislature. A law passed by initiative is no less a law than one enacted by the legislature. Nor is it more. A previously passed initiative can no more bind a current legislature than a previously enacted statute.[6]
¶ 4 The statutes that comprise the TPA, including those originating as initiatives, stand on the same footing with all other statutory enactments, equally subject to amendment by current and future legislatures. It is neither the prerogative nor the function of this court to substitute our judgment for that of the legislature or the people with respect to which laws are given effect. If a statute is constitutional, we will not invalidate it.
¶ 5 We are compelled by these principles to hold that section 7(6) of ESSB 6896, being a constitutionally valid enactment, is effective in establishing the fiscal year 2006 state expenditure limit. Because the ESHB 2314 taxes do not generate revenues in excess of the fiscal year 2006 expenditure limit as established, WSFB's challenge fails. Having resolved the matter, we decline to reach the other issues raised in this case, including the validity of other actions affecting the fiscal year 2006 expenditure limit, the constitutionality of the voter approval requirement of the TPA,[7] and WSFB's challenge to the *1146 legislative and executive privileges asserted by the State[8] during discovery.

I. FACTUAL AND PROCEDURAL HISTORY
A. Background
¶ 6 In 1993, Washington voters approved Initiative Measure 601. Laws of 1994, ch. 2. Initiative 601's stated intent included imposing a limit on the rate of growth in state expenditures and requiring voter approval of any tax increases that exceeded that limit. Former RCW 43.135.010(4)(a), (f) (1994). Initiative 601 was codified primarily at chapter 43.135 RCW, which the initiative named the TPA. RCW 43.135.902. The TPA has been revised, amended, and reenacted many times since its original approval by the voters.
¶ 7 The TPA limits spending from the state general fund during a fiscal year[9] to that fiscal year's expenditure limit and provides that taxes raising general fund revenues in excess of that expenditure limit must be approved by the voters.[10] Former RCW 43.135.025(1) (2005) provides that "[t]he state shall not expend from the general fund during any fiscal year state moneys in excess of the state expenditure limit established under [chapter 43.135 RCW]."[11] Former RCW 43.135.035(2)(a) (2005) further provides, in relevant part, that if legislative action raising state revenues "will result in expenditures in excess of the state expenditure limit, then the action . . . shall not take effect until approved by a vote of the people at a November general election."
¶ 8 The TPA establishes the state expenditure limit committee (ELC) to calculate state expenditure limits.[12] The ELC "determin[es] and adjust[s] the state expenditure limit as provided in this chapter."[13] Former RCW 43.135.025(5). The ELC meets every November to "adjust the expenditure limit for the preceding fiscal year based on actual expenditures and known changes in the fiscal growth factor and then project an expenditure limit for the next two fiscal years [the then current and the subsequent fiscal years]." Former RCW 43.135.025(6). The TPA also directs the ELC to adjust the expenditure limit based on other factors. By statute, the ELC must lower the expenditure limit if program costs or moneys are transferred out of the general fund to another fund or account.[14] Former RCW *1147 43.135.035(4). Correspondingly, the ELC must increase the expenditure limit if costs or moneys are transferred into the general fund from another fund or account.[15] Former RCW 43.135.035(5).
¶ 9 WSFB asserts that the TPA "sought to apply to the government the same age-tested financial advice given to our citizenscreate a budget, stick to that budget, and save for a rainy day." Resp'ts' Opening Br. on Cross-Appeal and Resp. to State's Opening Br. at 6-7. However, close examination reveals that the home economics model is a poor fit for the complexities of the state budgeting process. The governor must submit a budget to the legislature no later than December 20 of the calendar year preceding the legislative session during which that budget will be considered. RCW 43.88.060. The legislature must adopt a budget "not later than thirty calendar days prior" to the start of the next fiscal year. RCW 43.88.080. But as the TPA defines the state expenditure limit, the budget target governing these efforts, it cannot be calculated until considerably after the start of the fiscal year to which the limit applies.
¶ 10 The TPA defines the state expenditure limit for a given fiscal year as "the previous fiscal year's state expenditure limit increased by a percentage rate that equals the fiscal growth factor."[16] Former RCW 43.135.025(3). But a fiscal year expenditure limit is subject to change over the course of the fiscal year and is not finally determinable for any fiscal year until after that fiscal year is closed. Recall that the ELC, acting pursuant to statutory directive, adjusts the expenditure limit to reflect transfers of program costs and moneys into and out of the general fund during the course of that fiscal year, up through its close on June 30. Former RCW 43.135.035(4), (5). The ELC cannot definitively complete this set of adjustments until after the June 30 close of the fiscal year.
¶ 11 Additionally, at its November meeting, the ELC adjusts the preceding fiscal year's expenditure limit to reflect the "actual expenditures" made during that fiscal year. Former RCW 43.135.025(6). The adjustment to reflect actual expenditures, referred to as "rebasing" the spending limit, imposes a "spend it or lose it" rule on the legislature. If the legislature does not spend general fund moneys up to the fiscal year's expenditure limit, the limit is reduced by the unspent capacity for purposes of projecting the expenditure limits of future fiscal years. As with the adjustments reflecting transfers into and out of the general fund, the ELC cannot definitively identify actual expenditures made during a fiscal year until after the June 30 close of that fiscal year.
¶ 12 Notwithstanding the lag in availability of the previous fiscal year's state expenditure limit, the ELC is charged with producing expenditure limits for future fiscal years. Thus, each November the ELC calculates three expenditure limits: (1) a final adjusted expenditure limit for the fiscal year that concluded the previous June 30, plus projected limits, subject to future adjustment, for (2) the current fiscal year which began the previous July 1, and (3) the subsequent fiscal year which will begin the following July 1. Former RCW 43.135.025(6).
¶ 13 Applying this rubric to the circumstances presented in this case yields the following. The ELC, at its November 2004 meeting, adjusted the fiscal year 2004 expenditure limit to reflect actual expenditures, then used that adjusted limit to project expenditure limits for fiscal year 2005, then in *1148 progress, and fiscal year 2006, beginning July 1, 2005. During the 2005 legislative session, the legislature enacted a budget for fiscal year 2006, including the ESHB 2314 taxes challenged by WSFB. At its November 2005 meeting, the ELC adjusted the fiscal year 2005 expenditure limit to reflect actual expenditures, then revised the projected expenditure limit for fiscal year 2006, then in progress, and projected an expenditure limit for fiscal year 2007, beginning July 1, 2006.
B. The fiscal years 2005 and 2006 expenditure limits
¶ 14 In its 2005 regular session, the legislature took action to raise the expenditure limits for fiscal years 2005 and 2006 by $250 million. Section 1701 of Engrossed Substitute Senate Bill (ESSB) 6090 "transfer[red]" $250 million[17] from the health services account into the state general fund "for fiscal year 2005," explicitly providing that "the state expenditure limit shall be increased by the amount of the transfer."[18] LAWS OF 2005, ch. 518, § 1701. As discussed above, former RCW 43.135.035(5) provides that a transfer of funds to the general fund from other funds or accounts during a fiscal year increases the state expenditure limit for that year.
¶ 15 Section 1607 of ESSB 6090 made an "appropriation"an expenditureof $250 million from the state general fund to the violence reduction and drug enforcement account (VRDEA), directing that the money was "solely for deposit." LAWS OF 2005, ch. 518, § 1607. As discussed above, former RCW 43.135.025(6) directs that the expenditure limit be adjusted "based on actual expenditures" before projecting the expenditure limits for subsequent fiscal years. Finally, ESSB 6090, section 1701 also "transfer[red]" $250 million from VRDEA to the health services account. LAWS OF 2005, ch. 518, § 1701.
¶ 16 In November 2005, pursuant to former RCW 43.135.025(6), the ELC finalized the state expenditure limit for fiscal year 2005 and projected limits for fiscal year 2006 (the then-current fiscal year) and fiscal year 2007. As directed by the TPA, the ELC increased the fiscal year 2005 expenditure limit by the $250 million transfer into the general fund. Laws of 2005, ch. 518, § 1701; see also former RCW 43.135.035(5) (increase limit for transfer into general fund). Also as directed by the TPA, the ELC rebased the fiscal year 2005 actual expenditures to reflect the $250 million appropriation from the general fund, thereby using the additional expenditure limit capacity created by the transfer into the general fund from the health services account. LAWS OF 2005, ch. 518, § 1607; see also former RCW 43.135.025(6) (rebase for actual expenditures). The ELC then projected the fiscal year 2006 and 2007 expenditure limits from the rebased fiscal year 2005 expenditure limit, appropriately increased by the fiscal growth factor.
C. Procedural History
¶ 17 In July 2005, WSFB brought this action, seeking a declaration that ESHB 2314 raised revenues for expenditure in excess of the fiscal year 2006 expenditure limit and, therefore, was ineffective until approved by the voters under the terms of former RCW 43.135.035(2)(a).[19],[20] The revenue generated *1149 by ESHB 2314 began to accrue in fiscal year 2006, making the expenditure limit for fiscal year 2006 the focus of this litigation. LAWS OF 2005, ch. 514, § 1302 (stating effective date as July 1, 2005). WSFB's claim relied on two assumptions: (1) that the state expenditure limit pertinent to reviewing ESHB 2314 was the projected limit for fiscal year 2006 calculated by the ELC in November 2004, and (2) that the legislature's actions in ESSB 6090, sections 1607 and 1701 did not operate to raise the fiscal year 2006 expenditure limit by $250 million. Both WSFB and the State moved for summary judgment.
¶ 18 Before the trial court made any ruling on the merits of this litigation, the legislature enacted ESSB 6896 during its 2006 regular session. LAWS OF 2006, ch. 56. Section 7(6) of ESSB 6896 (hereinafter the 2006 amendment) directly amended former RCW 43.135.025(6), providing in relevant part that "[i]n calculating the expenditure limit for fiscal year 2006, the calculation shall be the expenditure limit established by the state expenditure limit committee in November 2005 adjusted as provided by this chapter and adjusted to include [certain specified appropriations]." The governor signed ESSB 6896 into law on March 15, 2006, two days before the summary judgment hearing. LAWS OF 2006, ch. 56. The 2006 amendment took effect immediately. Id. § 13.
¶ 19 Following the March 17, 2006 hearing, the trial court decided the case, granting summary judgment partially in favor of each side. As amended on reconsideration, the court granted summary judgment "with regard to the application of the voter approval requirement of RCW 43.135.035(2)(a)" in favor of WSFB on Parts I and II of ESHB 2314, and in favor of the State on "all other parts and sections of ESHB 2314." Def.'s Clerk's Papers at 10-11.
¶ 20 The State sought direct review. WSFB appealed to the Court of Appeals. We consolidated the appeals and granted direct review. The trial court's order was stayed pending resolution of this appeal.
¶ 21 The State challenges the trial court's determination that Parts I and II of ESHB 2314 are invalid absent voter approval under former RCW 43.135.035(2)(a).[21] WSFB challenges the trial court's determination that Part XI of ESHB 2314 did not trigger the voter approval requirement of former RCW 43.135.035(2)(a). WSFB also challenges the denial of its motion to compel discovery of documents regarding which the State claimed legislative and executive privilege.

II. ISSUE
¶ 22 Does the 2006 amendment, in which the legislature expressly adopted the fiscal year 2006 expenditure limit calculated by the ELC at its November 2005 meeting, establish the state expenditure limit for fiscal year 2006?[22]

III. ANALYSIS
A. Standard of review
¶ 23 WSFB claims that taxes enacted in Parts I and II of ESHB 2314 increase general fund revenues in excess of the expenditure limit for fiscal year 2006. WSFB claims, therefore, that these taxes are ineffective without prior voter approval under former RCW 43.135.035(2)(a) of the TPA, which provides that taxes raising general fund revenues "in excess of the state expenditure limit . . . shall not take effect until approved by a *1150 vote of the people." The State argues that the 2006 amendment raised the fiscal year 2006 expenditure limit by $250 million, thus increasing that limit beyond the additional revenues raised by ESHB 2314 and defeating WSFB's claim. Precise figures for the revenues generated by ESHB 2314 and the fiscal year 2006 expenditure limit are not critical to this case. It is undisputed that if the fiscal year 2006 expenditure limit was increased by $250 million, WSFB's claim that ESHB 2314 raised revenues in excess of that limit fails.
¶ 24 The trial court decided this case on summary judgment. We review rulings on summary judgment de novo. Berrocal v. Fernandez, 155 Wash.2d 585, 590, 121 P.3d 82 (2005). Only legal questions are before the court. We review questions of law de novo. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 9-10, 43 P.3d 4 (2002).
B. The 2006 amendment is a valid legislative enactment
¶ 25 "Our primary duty in interpreting any statute is to discern and implement the intent of the legislature." State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003). The legislature's intent in enacting the 2006 amendment is clear. The 2006 amendment revised former RCW 43.135.025(6), the provision that indicates how the state expenditure limit is calculated. The 2006 amendment's language provides, "[i]n calculating the expenditure limit for fiscal year 2006, the calculation shall be the expenditure limit established by the state expenditure limit committee in November 2005 adjusted as provided by this chapter and adjusted to include [certain specified appropriations]." Former RCW 43.135.025(6) (emphasis added). This language expressly adopts as the expenditure limit for fiscal year 2006 the amount calculated by the ELC at its November 2005 meeting, subject to adjustment as provided in chapter 43.135 RCW. The limit calculated by the ELC at its November 2005 meeting included the $250 million increase. The State argues that "[t]his direct and explicit amendment to the statute defines the general fund spending limit for fiscal year 2006" and thereby defeats WSFB's claim. State's Opening Br. at 25. We agree.
¶ 26 We find no barrier to the legislature enacting the 2006 amendment and revising former RCW 43.135.025(6) as it did. "[T]he legislature's power to enact a statute is unrestrained except where, either expressly or by fair inference, it is prohibited by the state and federal constitutions." State ex rel. Citizens v. Murphy, 151 Wash.2d 226, 248, 88 P.3d 375 (2004); accord State ex rel. Heavey v. Murphy, 138 Wash.2d 800, 809, 982 P.2d 611 (1999); State ex rel. Distilled Spirits Inst., Inc. v. Kinnear, 80 Wash.2d 175, 180, 492 P.2d 1012 (1972); State v. Fair, 35 Wash. 127, 133, 76 P. 731 (1904). "`Insofar as legislative power is not limited by the constitution it is unrestrained.'" Cedar County Comm. v. Munro, 134 Wash.2d 377, 386, 950 P.2d 446 (1998) (quoting Moses Lake Sch. Dist. No. 161 v. Big Bend Cmty. Coll., 81 Wash.2d 551, 555, 503 P.2d 86 (1972)).
¶ 27 Each duly elected legislature is fully vested with this plenary legislative power. "`A legislative assembly, when established, becomes vested with all the powers and privileges which are necessary and incidental to a free and unobstructed exercise of its appropriate functions.'" State ex rel. Robinson v. Fluent, 30 Wash.2d 194, 203-04, 191 P.2d 241 (1948) (quoting Ex parte McCarthy, 29 Cal. 395 (1866)). "`Plenary power in the legislature, for all purposes of civil government, is the rule. A prohibition to exercise a particular power is an exception.'" Fair, 35 Wash. at 132-33, 76 P. 731 (quoting People ex rel. Wood v. Draper, 15 N.Y. 532, 543 (1857)).
¶ 28 Implicit in the plenary power of each legislature is the principle that one legislature cannot enact a statute that prevents a future legislature from exercising its law-making power. As this court has recognized, there is "a general rule that one legislature cannot abridge the power of a succeeding legislature, and succeeding legislatures may repeal or modify acts of a former legislature."[23]Gruen v. State Tax Comm'n, 35 *1151 Wash.2d 1, 54, 211 P.2d 651 (1949), overruled on other grounds by State ex rel. Wash. State Fin. Comm. v. Martin, 62 Wash.2d 645, 384 P.2d 833 (1963). "[A]bsent contractual protection or some other form of constitutional restriction, nothing prevents one legislature from amending the work of a previous legislature." Kristen L. Fraser, Method, Procedure, Means, and Manner: Washington's Law of Law-Making, 39 GONZ. L.REV. 447, 478 (2003-2004) (footnotes omitted).
¶ 29 The state expenditure limit is a creature of statute, as are the laws that govern its calculation. The legislature is free to amend the expenditure limit and the process by which it is calculated. The legislature exercised this prerogative when it enacted the 2006 amendment. When the legislature enacts laws, it speaks as the chosen representative of the people. Clark v. Dwyer, 56 Wash.2d 425, 353 P.2d 941 (1960). It is neither our prerogative nor our function to substitute our judgment for the duly elected legislature's determination that the 2006 amendment was in the best interests of Washington State. Therefore, we are compelled to give the 2006 amendment its intended effect.
¶ 30 It is immaterial that former RCW 43.135.025(6), the target of the 2006 amendment, has its origins in an initiative. "[A]n initiative measure . . . is as much a legislative act as is [a statute]." Love v. King County, 181 Wash. 462, 469, 44 P.2d 175 (1935). When the people exercise their initiative power, they "exercise the same power of sovereignty as the Legislature does when enacting a statute." Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 204, 11 P.3d 762, 27 P.3d 608 (2000). The people cannot, by initiative, prevent future legislatures from exercising their law-making power.[24] A law passed by initiative is as subject to the legislative power of future legislatures as is any other statute. Thus, the fact that former RCW 43.135.025(6) originated as an initiative does not impede the legislature's ability to amend that statute.
¶ 31 Nor is the 2006 amendment invalid because it operates retroactively. "Unquestionably, the Legislature has the power to enact a retrospective[[25]] statute, unless the statute contravenes some constitutional inhibition." Lawson v. State, 107 Wash.2d 444, 454, 730 P.2d 1308 (1986). Barring a constitutional limitation, an amendment may operate retroactively if "`the legislature so intended'" or "`it is "curative."'" McGee Guest Home, Inc. v. Dep't of Soc. & Health Servs., 142 Wash.2d 316, 324-25, 12 P.3d 144 (2000) (quoting State v. Cruz, 139 Wash.2d 186, 191, 985 P.2d 384 (1999), superseded by statute on other grounds as stated in State v. Pillatos, 159 Wash.2d 459, 150 P.3d 1130 (2007)).
¶ 32 It is undisputed that the legislature intended the 2006 amendment to operate retroactively. This intent is implicit in the language and timing of the 2006 amendment. The 2006 amendment directs the process for calculating the expenditure limit for fiscal year 2006 through an enactment that took effect in March 2006, nine months after the start of that fiscal year on July 1, 2005.
¶ 33 The 2006 amendment is also curative in nature. An amendment that "`clarifies or technically corrects an ambiguous statute'" is curative. McGee Guest Home, 142 Wash.2d at 325, 12 P.3d 144 (quoting In re F.D. Processing, Inc., 119 Wash.2d 452, 461, 832 P.2d 1303 (1992)). "The Legislature's intent to clarify a statute is manifested by its adoption of the amendment `soon after controversies arose as to the interpretation of the original act.'" McGee Guest Home, 142 Wash.2d at 325, 12 P.3d 144 (internal quotation marks omitted) (quoting Johnson v. Cont'l W., Inc., 99 Wash.2d 555, 559, 663 P.2d 482 (1983)). The legislature enacted the 2006 amendment within months *1152 of WSFB initiating this action, and the 2006 amendment clarifies the meaning of former RCW 43.135.025(6) with respect to the fiscal year 2006 expenditure limit, the subject of that action.
¶ 34 Applying the 2006 amendment retroactively is not prescribed by separation of powers principles. "[T]he legislature is precluded by the constitutional doctrine of separation of powers from making judicial determinations." City of Tacoma v. O'Brien, 85 Wash.2d 266, 271, 534 P.2d 114 (1975). "[S]eparation of powers problems are raised when a subsequent legislative enactment is viewed as a clarification and applied retroactively, if the subsequent enactment contravenes the construction placed on the original statute by this court." Overton v. Econ. Assistance Auth., 96 Wash.2d 552, 558, 637 P.2d 652 (1981) (citing Johnson v. Morris, 87 Wash.2d 922, 557 P.2d 1299 (1976)). The 2006 amendment does not contradict a construction placed on former RCW 43.135.025 by any court. When the legislature enacted the 2006 amendment, not even the trial court had announced its construction of former RCW 43.135.025.
¶ 35 Nor is the legislature prohibited from "pass[ing] a law that directly impacts a case pending in Washington courts." Port of Seattle v. Pollution Control Hearings Bd., 151 Wash.2d 568, 625, 90 P.3d 659 (2004). "Litigation often brings to light latent ambiguities or unanswered questions that might not otherwise be apparent." United States v. Morton, 467 U.S. 822, 835 n. 21, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984). The legislature violates separation of powers principles by prescribing new rules to be applied to pending litigation only when doing so infringes on a judicial function by "`imped[ing] upon the court's right and duty to apply new law to the facts of this case,'" "`dictat[ing] how the court should decide a factual issue,'" or "`affect[ing] a final judgment.'" Pollution Control Hearings Bd., 151 Wash.2d at 626, 90 P.3d 659 (quoting Haberman v. Wash. Pub. Power Supply Sys., 109 Wash.2d 107, 143-44, 744 P.2d 1032, 750 P.2d 254 (1987)). A statutory amendment that is "a `facially neutral law for the court to apply to the facts before it,' [does] not violate the separation of powers." Id. (quoting Haberman, 109 Wash.2d at 144, 750 P.2d 254).
¶ 36 WSFB's contention that the retroactivity of the 2006 amendment violates due process is without merit. The legislature may not give an amendment retroactive effect "where the effect would be to interfere with vested rights." Lawson, 107 Wash.2d at 454-55, 730 P.2d 1308. But WSFB provides neither argument nor authority to support its novel theory that the citizens of Washington have a vested right to vote on taxes that are expected to raise general fund revenues in excess of the expenditure limit. This court has stated:
"[a] vested right, entitled to protection from legislation, must be something more than a mere expectation based upon an anticipated continuance of the existing law; it must have become a title, legal or equitable, to the present or future enjoyment of property, a demand, or a legal exemption from a demand by another."
Id. at 455, 730 P.2d 1308 (alteration in original) (internal quotation marks omitted) (quoting In re Marriage of MacDonald, 104 Wash.2d 745, 750, 709 P.2d 1196 (1985)). "No one has a vested right in any general rule of law or policy of legislation which gives an entitlement to insist that it remain unchanged for one's own benefit." Johnson, 99 Wash.2d at 563, 663 P.2d 482. Washington voters' statutory "right" to approve taxes that raise revenues in excess of the state expenditure limit is a mere expectationit is not a vested right entitled to due process protections from subsequently enacted legislation.
¶ 37 WSFB also argues that the 2006 amendment is inoperative because it violates article II, section 37 of the Washington Constitution. "Article II, section 37 requires legislation which revises or amends other acts to set them forth at full length; legislation which fails to do this will be held invalid."[26]Wash. Ass'n of Neighborhood Stores *1153 v. State, 149 Wash.2d 359, 373, 70 P.3d 920 (2003) (emphasis added). WSFB contends that the 2006 amendment violates this requirement because it does not amend former RCW 43.135.025(5), which establishes the ELC and grants it authority to determine the state expenditure limit. But the 2006 amendment sets forth the statute it amends, former RCW 43.135.025, in full, including section 5. See LAWS OF 2006, ch. 56, § 7. The constitutional requirements of article II, section 37 are satisfied.
¶ 38 Also citing former RCW 43.135.025(5), WSFB argues that the 2006 amendment is invalid in light of the ELC's exclusive power to determine the state expenditure limit. That is a very strong reading of former RCW 43.135.025(5), which does not restrict the legislature's own power to make decisions regarding the expenditure limit.[27] However, assuming without deciding that WSFB's proposed construction is correct, the 2006 amendment nonetheless remains valid. The 2006 amendment does not contravene the ELC's authorityto the contrary, it adopts as the expenditure limit for fiscal year 2006 the limit established by the ELC at its November 2005 meeting.
¶ 39 Finally, WSFB argues that in order for the voter approval requirement of former RCW 43.135.035(2)(a) to have any meaning, the challenged taxes must be measured against an estimated limit projected by the ELC in November 2004, because only that calculation was available prior to the enactment of the taxes. Giving effect to the 2006 amendment, WSFB further contends, will thwart the TPA's purpose to provide for voter approval of tax increases. This argument takes us full circle to the foundational principles on which this analysis is grounded. The legislature has plenary power to enact, amend, or repeal a statute, except as restrained by the state and federal constitutions. See, e.g., Murphy, 151 Wash.2d at 248, 88 P.3d 375. The state expenditure limit and the TPA are creatures of statute, which the legislature is free to amend. When it enacted the 2006 amendment, the legislature, speaking as the elected representative of the people, exercised this prerogative. Because it is not our function to substitute our judgment for that of the legislature in enacting the 2006 amendment, we give the 2006 amendment its intended effect.
¶ 40 "`Principles of judicial restraint dictate that if resolution of an issue effectively disposes of a case, we should resolve the case on that basis without reaching any other issues that might be presented.'" Hayden v. Mut. of Enumclaw Ins. Co., 141 Wash.2d 55, 68, 1 P.3d 1167 (2000) (internal quotation marks omitted) (quoting State v. Peterson, 133 Wash.2d 885, 894, 948 P.2d 381 (1997) (Talmadge, J., concurring)). We therefore decline to reach the other issues raised in this case, including (1) the validity of other legislative actions affecting the fiscal year 2006 expenditure limit and that of the ELC's actions at its November 2005 meeting, (2) the constitutionality of the former RCW 43.135.035(2)(a) voter approval requirement, and (3) the legislative and executive privileges issue.

IV. CONCLUSION
¶ 41 We find no basis on which to invalidate the 2006 amendment. The 2006 amendment is a valid exercise of the legislature's plenary power to enact laws, a power that encompasses amending former RCW 43.135.025(6) as the legislature sees fit. While the 2006 amendment operates retroactively, it does so within the limitations placed on retroactive statutes and without raising a separation of powers issue. WSFB's other proposed justifications for invalidating the 2006 amendment do not find adequate support *1154 in the law. It is neither the prerogative nor the function of this court to substitute our judgment for that of the legislature in enacting laws unless those laws clearly contravene state or federal constitutional provisions. Therefore, we hold that the 2006 amendment establishes the fiscal 2006 expenditure limit. Because the taxes enacted in ESHB 2314 Parts I and II do not generate general fund revenues in excess of the fiscal year 2006 expenditure limit thus established, WSFB's challenge fails. We therefore reverse that portion of the trial court's order ruling to the contrary and remand for entry of summary judgment in favor of the State.
WE CONCUR: CHARLES W. JOHNSON, BARBARA A. MADSEN, BOBBE J. BRIDGE, SUSAN OWENS, Justices.
ALEXANDER, C.J. (concurring).
¶ 42 I agree with the majority that we should decide a case on statutory grounds, rather than constitutional grounds, when possible. Majority at 291 n. 7, 174 P.3d at 1145-46 n. 7. In this case, though, I believe we must necessarily decide the constitutional issue. I say that because in order to determine whether the Taxpayer Protection Act (TPA) (chapter 43.135 RCW) or Engrossed Substitute Senate Bill 6896 (the 2006 amendment) are constitutionally valid, it is necessary to determine first whether the people may constrain the plenary powers of the legislature by initiative. This is a constitutional questionone that we have already answered in Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 11 P.3d 762, 27 P.3d 608 (2000), and one that the majority really answers in the course of evaluating the 2006 amendment's validity, majority at 301-02, 174 P.3d at 1150-51.
¶ 43 Essentially, I agree with Justice Chambers that the TPA is an unconstitutional intrusion into the legislature's plenary power to pass laws. Accordingly, I, too, conclude that the Washington State Farm Bureau Federation's challenge based on the TPA fails. Thus, I concur in the result the majority reaches.
SANDERS, J. (concurring).
¶ 44 I am troubled by the majority's claim (echoed in Justice Chambers' concurrence at 319-20, 174 P.3d at 1159-60) that
It is a fundamental principle of our system of government that the legislature has plenary power to enact laws, except as limited by our state and federal constitutions. Each duly elected legislature is fully vested with this plenary power.
Majority at 289-90, 174 P.3d at 1144-45.
¶ 45 I understand that the majority's view to be the state legislature is virtually unrestrained except insofar as the legislative action countervenes some express prohibition in the state constitution. Although this claim has been repeated by rote in several of our decisions, I am unable to find a single one which explains its rationale, much less critically examines its premise. I challenge the majority to either do so here or dispense with this careless rhetoric.
¶ 46 The assertion seems to be based on an erroneous presumption that state governments have inherent powersa presumption that contradicts the basic premise of all American governance that all power resides in the people except insofar as it has been delegated to the government. As such, the claim flies in the face of article I, section 1 of the state constitution, which plainly and expressly provides:
All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights.
This section hardly evidences our state government has the inherent power to do anything. Rather, it stands for precisely the opposite.[1]
¶ 47 Our majority also appears to be oblivious to the basic tenet of the American Revolution, which forcefully rejected the European model of unlimited government. Prior to *1155 Washington's statehood our Territorial Supreme Court construed language in the Oregon Organic Act which granted to the territorial legislature "a legislative power extending to `all rightful subjects of legislation, not inconsistent with the Constitution and laws of the United States' (9 stat. 325, s. 16)." Maynard v. Valentine, 2 Wash. Terr. 3, 14, 3 P. 195, 200 (1880). The court reasoned, "The language of the Organic Act, declaring that the legislative power shall extend to all rightful subjects of legislation, implies that there are some subjects of legislation that are not rightful." Id. Pertinent to the issue at hand, the Territorial Supreme Court eloquently described the foundation principle of American governance:
A legislature with undefined powers has all legislative powers. It can lay down the laws in every direction, moulding all persons and things, and each particular person and thing conclusively to what it says, determining absolutely and finally every question by its fiat. Its voice is the voice of the governing power, and the voice of the governing power is the voice of God. From that there is no appeal. Great Britain's Parliament is an example of such a Legislature. . . . American legislatures are different, simply because limited. Higher legislation than any one of them is capable of has at one breath called them into being and circumscribed their activities. The National and State legislatures have their bounds set by what the people have enacted in the National and State constitutions.
Id. at 13-14, 3 P. 195.
¶ 48 Therefore I think it is fair to say not only is the majority's claim inconsistent with the text of our state constitution but profoundly un-American in theory as well. As Chief Justice Chase opined, "To maintain that our federal, or state legislature possesses such powers, if they had not been expressly restrained; would, in my opinion, be a political heresy, altogether inadmissible in our free republican governments." Calder v. Bull, 3 U.S. (3 Dall.) 386, 388-89, 1 L.Ed. 648 (1798).
¶ 49 The majority's unexamined claim in reality invites a totalitarian regime and is inconsistent with the founders' understanding of the social compact.
I cannot subscribe to the omnipotence of a state legislature, or that it is absolute and without control; although its authority should not be expressly restrained by the constitution, or fundamental law of the state. . . . The purposes for which men enter into society will determine the nature and terms of the social compact; and as they are the foundation of the legislative power, they will decide what are the proper objects of it. . . . There are acts which the federal, or state legislature cannot do, without exceeding their authority.
Id. at 387-88.
¶ 50 But the majority's claim on its face purports that the legislature may do virtually anything except where restrained by a Declaration of Rights. This has never been our system, as we have often observed even the constitutionally undefined police power is not itself without limits.
"It is to be observed, therefore, that the police power of the government, as understood in the constitutional law of the United States, is simply the power of government to establish provisions for the enforcement of the common as well as civil-law maxim, sic utere tuo ut alienum non laedas. . . . `it being of universal application, it must of course be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others.' Any law which goes beyond that principle, which undertakes to abolish rights, the exercise of which does not involve an infringement of the rights of others, or to limit the exercise of rights beyond what is necessary to provide for the public welfare and the general security, cannot be included in the police power of the government. It is a governmental usurpation, and violates the principles of abstract justice, as they have been developed under our republican institutions."
City of Seattle v. Ford, 144 Wash. 107, 111, 257 P. 243 (1927) (quoting 1 Christopher G. Tiedeman, A Treatise on State and Federal Control of Persons and Property in the United States 4 (1900)). See also Karasek v. *1156 Peier, 22 Wash. 419, 426-27, 61 P. 33 (1900) ("[A]ny provision or regulation of the use and enjoyment of land by the owner which is not limited to the prevention of nuisances is opposed to constitutional principles; and the power of the legislature to prohibit nuisances is confined to the prohibition or regulation of such acts as violate, or materially interfere with, the rights of others.").
¶ 51 I also note with alarm the seditious doctrine sometimes embraced by our majority that even our Declaration of Rights is itself trumped by exercise of the state's police power, a power which a majority of my colleagues seems to believe with their new-found wisdom has no limits whatsoever.[2] For example article I, section 24 of our constitution, protecting the right to bear arms, was an early casualty of this view as many cases purport to hold that the right to bear arms, although constitutionally guaranteed,[3] is subject to reasonable regulation under the police power. See, e.g., City of Seattle v. Montana, 129 Wash.2d 583, 593, 919 P.2d 1218 (1996). Additionally our constitutional guaranties of religious liberty, also secured in very absolute terms by article I, section 11 of our constitution, are similarly subordinated to the police power. See Open Door Baptist Church v. Clark County, 140 Wash.2d 143, 167, 995 P.2d 33, 46 (2000). This caused the alarm to be sounded in another context,
So what is next? Privacy? Press? Speech? Assembly? Can it not be argued that these are also at the mercy of the police powera power which some argue only ends with the declaration of rights, but now predominates over even that? I am reminded of the prophecy of our first supreme court justice, Theodore Stiles, that the ever-expanding notions of "police power" are "liveries of heaven, stolen to serve the devil in." Richard B. Sanders, Battles for the State Constitution: A Dissenter's View, 37 GONZAGA L.REV. 1, 7 (2001-02).
¶ 52 The view that the federal Bill of Rights or state Declaration of Rights is subject to the otherwise legitimate government action is plainly inconsistent with the fundamental theory of American governance. Federalist No. 84, authored by Alexander Hamilton, defended the proposed Constitution of 1787 against the principal attack that it failed to contain a Bill of Rights. Hamilton countered that a Bill of Rights was
not only unnecessary in the proposed constitution, but would even be dangerous. They would contain various exceptions to powers which are not granted; and on this very account, would afford a colourable pretext to claim more than were granted. For why declare that things shall not be done which there is no power to do? Why, for instance, should it be said, that the liberty of the press shall not be restrained, when no power is given by which restrictions may be imposed?
THE FEDERALIST No. 84, at 579 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (emphasis added). So, to put it another way, the Bill of Rights, or Declaration of Rights, properly understood, is an enumeration of exceptions to what the government may otherwise legitimately do. Yet our majority rejects this view to virtually nullify the only purpose of a Declaration of Rights by claiming it is subordinate to an otherwise almost unlimited exercise of the police power, which removes any restraint at all to the claimed "inherent" and infinite "plenary power" of the legislature.
¶ 53 Fundamentally, when a majority of our court claims that our state legislature has "plenary power to enact laws, except as limited by our state and federal constitutions," it departs from the founding principle *1157 that governments may legitimately perform only those activities which are delegated by the sovereign people. Moreover, the majority seems most willing to even subordinate express constitutional exceptions enumerated in the Declaration of Rights and elsewhere to the omnipotent power of the "plenary" state.
¶ 54 I fear for our Republic each step the majority takes toward achieving its counterrevolutionary premise. One cries outrage when the majority purports to recognize "a fundamental principal of our system of government," which is in reality absolutely antithetical to those true principles of our Republic, which are indeed fundamental.
¶ 55 Aside from that, I concur in the remainder of the majority's opinion.
WE CONCUR: JAMES M. JOHNSON, Justice.
CHAMBERS, J. (concurring).
¶ 56 There is an elephant in the courthouse. The majority knows the elephant is there. The majority maps out a course around the elephant. The majority never acknowledges the presence of the elephant.
¶ 57 It is an obvious elephant. Several years ago, a certain state supreme court justice was speaking to a classroom of high school students. Initiative 601 (I-601), the act that is ultimately before us today, came up. During the discussion, the judge explained that article II of the state constitution gives each legislature the power to pass laws, including the power to pass tax increases. Later, the judge explained that I-601 gave the people the power to veto all future tax increases passed by all future legislatures. One astute student asked, "then doesn't I-601 conflict with the state constitution?" The judge adeptly avoided the question by noting that, although the issue had been raised, the state supreme court had not yet reached it.
¶ 58 The elephant that we all keep circling around is the fundamental principle upon which our government is structured. Our constitutions create a representative democracy. It is time we recognized the elephant and confront the constitutional question. To the point, until our state constitution is amended, no legislative body may disarm future legislatures or electorates by removing or limiting the power to legislate or to fund state programs. See Const. art. II. While the majority correctly concludes that no legislative body, including the people legislating by initiative, can bind future legislative bodies, the majority fails to acknowledge that this conclusion is driven by our constitution. At its core, this case is about that constitutional question. Certainly, we can avoid this question. See majority at 291 n. 7, 174 P.3d at 1145 n. 7. But we have the undoubted power to decide it. I think we should.
¶ 59 "The brilliance of our constitution is in its checks and balances." Wash. State Labor Council v. Reed, 149 Wash.2d 48, 61, 65 P.3d 1203 (2003) (Chambers, J., concurring). The founders sought to protect many societal interests and to prevent any one political force from dominating any other, and instead to foster the "permanent and aggregate interests of the community" as a whole. THE FEDERALIST No. 10 (James Madison), available at http://www.yale.edu/lawweb/avalon/ federal/fed10.htm. The most obvious example is well known. The large populations of large states needed a proportionate voice. The independence of the small states also needed to be protected. The bicameral legislature, with one house divided by population; the other by state, protects both. The founders also debated the advantages and disadvantages of direct democracy versus representative democracy. They rejected pure democracy in part out of fear that the people as a whole might put their own "immediate" and "temporary or partial considerations" before the "public good and the rights of other citizens." Id. To avoid this, the founders adopted a representative democracy they referred to as a "republic" or "republican" form of government. See ROBERT J. MORGAN, JAMES MADISON ON THE CONSTITUTION AND THE BILL OF RIGHTS 55-56 (1988).
¶ 60 One of the founders was James Madison, a principal architect of our federal constitution. BERNARD SCHWARTZ, MAIN CURRENTS IN AMERICAN LEGAL THOUGHT 84 (1993). He drafted the Virginia Plan, which became *1158 the framework around which our constitution took shape. Id. at 85. As Madison explained in his Federalist 10,
A republic, by which I mean a government in which the scheme of representation takes place, opens a different prospect, and promises the cure for which we are seeking. Let us examine the points in which it varies from pure democracy, and we shall comprehend both the nature of the cure and the efficacy which it must derive from the Union.
The two great points of difference between a democracy and a republic are: first, the delegation of the government, in the latter, to a small number of citizens elected by the rest; secondly, the greater number of citizens, and greater sphere of country, over which the latter may be extended.
The effect of the first difference is, on the one hand, to refine and enlarge the public views, by passing them through the medium of a chosen body of citizens, whose wisdom may best discern the true interest of their country, and whose patriotism and love of justice will be least likely to sacrifice it to temporary or partial considerations.
THE FEDERALIST No. 10 (James Madison), available at http://www.yale.edu/lawweb/ avalon/federal/fed10.htm.
¶ 61 On a practical level, the founders likely foresaw that the people would want better roads, schools, and other public works, but be reluctant to impose a tax on themselves sufficient to fund each project. By establishing a representative democracy, the founders created a system where the people would elect representatives who would hopefully be "enlightened statesmen." These men and women would be able to set aside "temporary passions" to make the hard decisions and the hard sacrifices for the public good through a deliberative exercise. These representatives would be checked by the people through regular elections. Our founders were wise. Our republic and our constitution have withstood the tests of time.
¶ 62 More than 100 years after the 1787 debate in Philadelphia, the drafters of the Washington Constitution had their own convention. See generally 2 Wilfred J. Airey, A History of the Constitution and Government of Washington Territory 438-522 (1945) (unpublished Ph.D. thesis, University of Washington) (on file with Washington State Law Library); see also ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 3 (2002). They too embraced representative government. See CONST. art. II. Our state constitution provides for the election of a bicameral legislature composed of a house of representatives and a senate. Id. Our constitution also vests our legislature with the power to legislate and the power to tax. CONST. art. II, § 1; art. VII, § 1. Our founders could have given the people an automatic veto over legislation. They did not. Our founders could have checked legislative power by conditioning all tax increases upon the approval of the people. They did not. The people adopted the constitution in 1889, and in doing so they surrendered whatever legislative power they may have had by vesting it in the legislature under the original article II, section 1. Indeed, under the original version of article II, section 1, the legislature itself "lacked the authority to condition measures on a vote of the people." Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 241, 11 P.3d 762 (2000) (ATU).
¶ 63 In 1912, 23 years after adopting the state constitution, the people of Washington claimed the power of initiative and referendum by passing the Seventh Amendment. The amendment gives the people the power to legislate through an initiative and to veto legislation through a referendum, and it gives the legislature the power to refer a particular measure to the voters for voter approval. CONST. art. II, § 1(b); ATU, 142 Wash.2d at 231, 232 n. 13, 11 P.3d 762. None of the amendments since that time have changed this core aspect of article II, section 1. See WASH. CONST. amends. 7, 30, 36, 72.
¶ 64 Again, before the Seventh Amendment, the legislature lacked the authority to condition legislation on statewide voter approval. Ruano v. Spellman, 81 Wash.2d 820, 823, 505 P.2d 447 (1973). The Seventh Amendment (largely) gave to the people the *1159 same power and authority exercised by the legislature (with exceptions not relevant here). See ATU, 142 Wash.2d at 241, 11 P.3d 762 (quoting in part Love v. King County, 181 Wash. 462, 469, 44 P.2d 175 (1935)). The power of initiative and referendum does not give the people the power to condition a future state law on future approval of the people, any more than it gave that power to the legislature.[1]Id. Neither does the power to disapprove of a bill via a referendum somehow give the people the power to condition all future state measures upon a vote of the people. Instead, the Seventh Amendment specifically sets forth the manner in which the initiative and referendum authority must be exercised. Id. at 238, 11 P.3d 762. Referendum proponents must gather the signatures of four percent of the voters "each time the people petition for a referendum on a piece of legislation the Legislature has passed." Id. at 242, 11 P.3d 762. Simply put, the power to call for a referendum is the power to call for the repeal of a bill, not the power "conditioning all future state measures of a certain class on voter approval." Id.
¶ 65 Finally, and perhaps most importantly for this discussion, "[t]he initiative process cannot be used to amend the constitution." Id. at 232, 11 P.3d 762 (citing Gerberding v. Munro, 134 Wash.2d 188, 210 n. 11, 949 P.2d 1366 (1998)); see also Culliton v. Chase, 174 Wash. 363, 373-74, 25 P.2d 81 (1933). Just like the legislature, the people must conform to the requirements of the constitution when exercising their legislative authority under the Seventh Amendment. I-601and its legislative descendentsis unconstitutional because it purports to condition an entire class of legislation on voter approval. That is direct democracy. That is not our system.
¶ 66 Again, our founders rejected a direct democracy in favor of a representative one. Cf. U.S. CONST. art. IV, § 4 ("The United States shall guarantee to every state in this union a republican form of government."). We have a representative form of government in part because our government is a government of checks and balances. Among other checks and balances are the checks on the people when acting in a legislative or executive capacity. There, the power of the people is checked by the formal requirements of constitutional law making. Right or wrong, good or bad, until our constitution is amended, neither the people through their initiative and referendum powers nor the legislature through its general legislative powers may prevent a future body of duly elected legislators from exercising their constitutional authority to pass laws or raise taxes.
¶ 67 Not only is this readily obvious and easily understood by astute high school students, we have said all of this before. "Neither the Legislature nor the people acting in their legislative capacity has the power to condition a state law solely on voter approval. . . ." ATU, 142 Wash.2d at 241, 11 P.3d 762.[2] Nor can one legislature require future legislatures to refer a class of legislation for referendum. Larson v. Seattle Popular Monorail Auth., 156 Wash.2d 752, 759, 131 P.3d 892 (2006); accord Leroux v. Sec'y of State, 465 Mich. 594, 615, 640 N.W.2d 849 (2002) ("It is a fundamental principle that one Legislature cannot bind a future Legislature *1160 or limit its power to amend or repeal statutes. Absent the creation of contract rights, the later Legislature is free to amend or repeal existing statutory provisions."); Ohio Life Ins. & Trust Co. v. Debolt, 57 U.S. (16 How.) 416, 431, 14 L.Ed. 997 (1854) ("no one legislature can, by its own act, disarm their successors of any of the powers or rights of sovereignty confided by the people to the legislative body, unless they are authorized to do so by the constitution under which they are elected").
¶ 68 "[D]isarming their successors" of the power to tax is exactly what I-601 attempted to do. But under our jurisprudence, some positive step has to be taken in regard to each piece of legislation before it may be referred to the people for a referendum. Larson, 156 Wash.2d at 759, 131 P.3d 892; ATU, 142 Wash.2d at 241-42, 11 P.3d 762 (affirming legislative power to subject a "particular measure" to a referendum but not the people's power to require a referendum on a class of legislation).
¶ 69 Although we have not directly addressed the constitutionality of I-601 in light of article II, section 1, we have already substantially answered this question. See ATU, 142 Wash.2d at 241-42, 11 P.3d 762. There, we held that the right of referendum
must be exercised in conformity with the constitutionally mandated procedures, including the four percent voter signature requirement each time the people petition for a referendum on a piece of legislation the Legislature has passed. Nor [does our holding] mean that the Legislature cannot refer a measure to the people for a statewide vote. Plainly it can do so, not, however, as conditional legislation, but rather through the referendum process set forth in article II, section 1(b).
Id. at 242, 11 P.3d 762 (emphasis added).
¶ 70 Our liberties are protected by carefully designed separation of powers within a framework of checks and balances. No one branch is more equal than another. All power must be exercised within the framework established by our constitution. I would recognize the elephant is there once and for all. Answering the underlying question is principled, is definitive, and will serve the public good. I would hold that I-601's referendum requirement is an unconstitutional intrusion into the legislature's plenary power to pass laws. See CONST. art. II, § 1; Larson, 156 Wash.2d at 759, 131 P.3d 892; ATU, 142 Wash.2d at 242, 11 P.3d 762. Our respect for the text and for the checks and balances of our constitutional system of government demands no less.
J.M. JOHNSON, J. (concurring).
¶ 71 This is an easy case. By a majority vote, the legislature may amend any initiative two years after the people enact it. WASH. CONST. art. II, § 41. In 2006, the legislature amended the Taxpayer Protection Act (chapter 43.135 RCW), which the people enacted in 1994.[1] Since the legislature was constitutionally allowed to do so, I must concur with the majority.
¶ 72 One concurring opinion (Chambers, J.), however, would use this simple case to propose a version of constitutional law that overlooks important provisions of the Washington Constitution and is historically inaccurate. This requires rebuttal.
¶ 73 Washington's Constitution begins with its most important concept: "All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights." WASH. CONST. art. I, § 1. Far from seeking "to foster the `permanent and aggregate interests of the community' as a whole," Washington's constitution creates a system to protect individual rights. Concurrence (Chambers, J.) at 314, 174 P.3d at 1157 (quoting THE FEDERALIST No. 10 (James Madison)). Indeed, in intentional contrast with the United States Constitution, our founders devoted the first article of our constitution to a declaration of individual rights.
¶ 74 Justice Chambers then suggests that the "core aspect" of legislature dominance survived the 1912 passage of the Seventh Amendment by our people. Concurrence (Chambers, J.) at 317, 174 P.3d at 1158-59. *1161 Ironically, that amendment, allowing direct legislation by the people, was intended as an antidote to just such thinking (as was the concurrent Eighth Amendment providing for recall of public officials). The amendment's words make this point clear: "The legislative authority of the state of Washington shall be vested in the legislature . . . but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature." WASH. CONST. art. II, § 1. Further, through referendum, the people also "reserve power, at their own option, to approve or reject . . . any act, item, section, or part of any bill, act, or law passed by the legislature." Id. So the argument that ours does not envision direct democracy contradicts the constitution, and especially the early Seventh Amendment. Concurrence (Chambers, J.) at 318, 174 P.3d at 1159.
¶ 75 Given the constitution's republican starting point  that power comes from the people  the representative form of Washington's government cannot be said to exist only as a "check[] on the people when acting in a legislative or executive capacity." Concurrence (Chambers, J.) at 318, 174 P.3d at 1159. Rather, our government exists "to protect and maintain individual rights." WASH. CONST. art. I, § 1. Representative government is a tool to those ends, and when not fulfilling the purpose of protecting individual rights, the people can protect those rights on their own with an initiative or a referendum.
¶ 76 Justice Chambers also gets the historical definition wrong when he claims that the "`republican' form of government," guaranteed by article IV, section 4 of the United States Constitution, is, by definition, a government by representative assembly. Concurrence (Chambers, J.) at 315, 174 P.3d at 1157-58. One of The Federalist's authors, James Madison, writing as Publius, did refer to his (Madison's) preferred form of a republic as a government through representatives. THE FEDERALIST No. 10 (James Madison).[2] This was Madison's version of the general understanding of "republic"  but differed from the understanding of most of the founding generation. See THE FEDERALIST No. 14, at 83 (James Madison) (Jacob E. Cooke ed., 1961) (noting the "prevalen[t] . . . confounding of a republic with a democracy").
¶ 77 Indeed, beyond Madison, all of the federal founders understood a republic as simply that government where power derives from the people, instead of from a king or deity. AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 277 (2005). North Carolina's James Iredell, later a justice of the United States Supreme Court, believed the republican government clause in article IV simply meant that "no state should have a right to establish an aristocracy or monarchy." 4 DEBATES IN SEVERAL STATE CONVENTIONS ON ADOPTION OF FEDERAL CONSTITUTION, AS RECOMMENDED BY GENERAL CONVENTION AT PHILADELPHIA, IN 1787, at 195 (Jonathan Elliot ed., Wm. S. Hein & Co.2d ed.1996) (1891). James Wilson of Pennsylvania defined a republican government as one where "the people at large . . . either collectively or by representation" form the legislature. 2 DEBATES IN SEVERAL STATE CONVENTIONS ON ADOPTION OF FEDERAL CONSTITUTION, AS RECOMMENDED BY GENERAL CONVENTION AT PHILADELPHIA, IN 1787, at 433 (Jonathan Elliot ed., Wm. S. Hein & Co.2d ed.1996) (1891) (emphasis added). Alexander Hamilton wrote one "corner stone of republican government" was "the prohibition of titles of nobility." THE FEDERALIST No. 84, at 577 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). The federal constitutional crafters defined "republic" simply as a government where the people are sovereign; not less, but certainly not more.
¶ 78 The English historical examples immediately familiar to the founders further prove this point. England was nearly continuously governed by a monarchy with power in and from a king. The exception was the Cromwell Republic after the execution of King Charles I. The period is called the *1162 "republic" precisely because there was no monarch until the Restoration in 1661. See Robert G. Natelson, A Republic, Not a Democracy? Initiative, Referendum, and the Constitution's Guarantee Clause, 80 TEX. L.REV. 807, 823 n. 76 (2002). Domestic examples further illustrate the historical understanding. For example, there is no doubt Massachusetts had a republican government in 1789, notwithstanding its common practice of government by direct democracy in the form of town meetings. AMAR, supra, at 277.
¶ 79 Correcting this history is important to assure historical error does not contaminate our interpretation of Washington's constitution, ratified nearly a century after its federal counterpart. Our drafters had a chance to consider a representative democracy in many forms. Rather than believing representatives to be inevitably a group of "`enlightened statesmen' . . . able to set aside `temporary passions' to make the hard decisions . . . through a deliberative exercise," concurrence (Chambers, J.) at 316, 174 P.3d at 1158, they had seen the likes of John H. Schively, Washington's insurance commissioner, who extorted thousands of dollars by abusing his official position. When the House of Representatives impeached him, the Senate, dominated by special interests, failed to remove him from office. See generally JOURNAL OF SENATE OF STATE OF WASHINGTON SITTING AS A COURT OF IMPEACHMENT FOR TRIAL OF JOHN H. SCHIVELY, Ex.Sess., at 12-31, 848 (Wash. 1909).
¶ 80 Those campaigning for Washington's Seventh and Eight Amendments undoubtedly would have preferred wise legislators providing them with competent service. "But we seldom get such service, and we many times need the power of Direct Legislation so that we may lock the barn before the horse is stolen." DIRECT LEGISLATION LEAGUE OF WASHINGTON, DIRECT LEGISLATION OR THE INITIATIVE, REFERENDUM, AND RECALL 4 (1912), available at http://www.secstate.wa.gov/ oralhistory/pdf/OH448.pdf. These supporting initiative and referendum knew "the great need is to check the harmful and hasty acts of the legislature." Id. at 7.
¶ 81 Washingtonians adopted the Seventh Amendment because they found their elected officials sometimes corrupt and often shortsighted. The solution was always more control by the people. The contemporaneous Eighth Amendment, allowing voter recall of public officials initiated by petition, served the same purpose.
¶ 82 "The brilliance of our constitution is [not only] in its checks and balances," Wash. State Labor Council v. Reed, 149 Wash.2d 48, 61, 65 P.3d 1203 (2003) (Chambers, J., concurring), though the initiative and referendum are a part of these checks. More fundamentally, the brilliance of our system is in its devotion to the sovereignty of the people and the rule that those who must bear the law may make the law. With these corrections, I concur.
WE CONCUR: RICHARD B. SANDERS, Justice.
NOTES
[1] This opinion refers collectively to all of the respondents, including the Washington State Farm Bureau Federation, the Washington State Grange, the National Federation of Independent Business, the Building Industry Association of Washington, the Evergreen Freedom Foundation, the Washington Association of Realtors®, and Steve Neighbors, as WSFB.
[2] LAWS OF 2005, ch. 514.
[3] LAWS OF 2006, ch. 56, § 7(6).
[4] Justice Sanders has again expressed his view that this court has a long standing, but mistaken, understanding of the foundational principles of state government. See concurrence (Sanders, J.); see also, e.g., Island County v. State, 135 Wash.2d 141, 955 P.2d 377 (1998) (Sanders, J., concurring); Richard B. Sanders & Barbara Mahoney, Restoration of Limited State Constitutional Government: A Dissenter's View, 59 N.Y.U. ANN. SURV. AM. L. 269 (2003). While we respect his viewpoint, we remain committed to the model of government consistently articulated by this court. State ex rel. Citizens Against Tolls v. Murphy, 151 Wash.2d 226, 248, 88 P.3d 375 (2004) ("[T]he legislature's power to enact a statute is unrestrained except where, either expressly or by fair inference, it is prohibited by the state and federal constitutions."); accord State ex rel. Heavey v. Murphy, 138 Wash.2d 800, 809, 982 P.2d 611 (1999); State ex rel. Distilled Spirits Inst., Inc. v. Kinnear, 80 Wash.2d 175, 180, 492 P.2d 1012 (1972); State v. Fair, 35 Wash. 127, 133, 76 P. 731 (1904).

Further, we respectfully disagree that this opinion implies that the general police power of the State renders specifically enumerated rights in article I nullities. We make no such holding.
[5] An exception to this rule, the binding nature of contractual obligations entered by the State through the authorized actions of previous legislatures, is not relevant here. See Gruen v. State Tax Comm'n, 35 Wash.2d 1, 54, 211 P.2d 651 (1949), overruled on other grounds by State ex rel. Wash. State Fin. Comm. v. Martin, 62 Wash.2d 645, 384 P.2d 833 (1963).
[6] The Washington Constitution does impose some limits on the legislature's ability to amend or repeal laws passed by initiative. Under article II, section 1(c), an initiative may not be amended or repealed by the legislature within a two year period following such enactment, except that it may be amended within that two year period by a two-thirds vote of the legislature.
[7] Justice Chambers would "recognize[ ] . . . and confront the constitutional question." Concurrence (Chambers, J.) at 314, 174 P.3d at 1157. Chief Justice Alexander agrees. Concurrence (Alexander, C.J.). However, "[w]e adhere to the fundamental principle that if a case can be decided on nonconstitutional grounds, an appellate court should refrain from deciding constitutional issues." Isla Verde Int'l Holdings, Inc. v. City of Camas, 146 Wash.2d 740, 752, 49 P.3d 867 (2002); accord Tunstall v. Bergeson, 141 Wash.2d 201, 210, 5 P.3d 691 (2000) (where issue may be resolved on statutory grounds, court will avoid deciding issue on constitutional grounds); Tropiano v. City of Tacoma, 105 Wash.2d 873, 877, 718 P.2d 801 (1986) ("This court will not decide an issue on constitutional grounds if the issue can be resolved on other grounds."); Tommy P. v. Bd. of County Comm'rs, 97 Wash.2d 385, 391, 645 P.2d 697 (1982) (where case can be resolved on other grounds, court will not reach constitutional issue); Senear v. Daily Journal-Am., 97 Wash.2d 148, 152, 641 P.2d 1180 (1982) (same); Ohnstad v. City of Tacoma, 64 Wash.2d 904, 907, 395 P.2d 97 (1964) (same).
[8] This opinion refers collectively to all of the petitioners, including Governor Christine Gregoire, the State Expenditure Limit Committee, and the state of Washington, as State.
[9] A fiscal year begins on July 1 and ends the following June 30. RCW 43.88.020(12). Fiscal years take their names from the calendar years in which they end. For example, fiscal year 2006 is the fiscal year beginning July 1, 2005, and ending June 30, 2006.
[10] The state treasury is comprised of numerous accounts and funds established by law for various purposes. See, e.g., RCW 43.84.092(4) (partial list of accounts in treasury). At all times relevant to this action, the state expenditure limit applied only to general fund spending. Effective July 1, 2007, applicability of the state expenditure limit extends to several "related funds" in addition to the general fund. LAWS OF 2005, ch. 72, § 4 (amending RCW 43.135.025 effective July 1, 2007).
[11] Former RCW 43.135.035(3)(a) (2005) provides that "[t]he state expenditure limit may be exceeded upon declaration of an emergency," within certain delineated circumstances.
[12] The ELC was created, not by Initiative 601, but by the legislature through a later enactment. LAWS OF 2000, 2d Sp. Sess., ch. 2, § 1 (amending RCW 43.135.025).
[13] The ELC consists of "the director of financial management, the attorney general or the attorney general's designee, and the chairs of the senate committee on ways and means and the house of representatives committee on appropriations." Former RCW 43.135.025(5). Effective July 1, 2007, the ELC includes the ranking minority members of the two legislative committees. LAWS OF 2005, ch. 72, § 4 (amending former RCW 43.135.025). The attorney general's designee recused from the ELC during this litigation.
[14] Former RCW 43.135.035(4) provides, in relevant part, that "[i]f the cost of any state program or function is shifted from the state general fund . . . to another source of funding, or if moneys are transferred from the state general fund to another fund or account, the state expenditure limit committee . . . shall lower the state expenditure limit to reflect the shift."
[15] Former RCW 43.135.035(5) provides, in relevant part, that "[i]f the cost of any state program or function is shifted to the state general fund . . . from another source of funding, or if moneys are transferred to the state general fund from another fund or account, the state expenditure limit committee . . . shall increase the state expenditure limit to reflect the shift."
[16] The "`[f]iscal growth factor'" is currently defined as "the average of the sum of inflation and population change for each of the prior three fiscal years." Former RCW 43.135.025(7). Effective July 1, 2007, the fiscal growth factor is "the average growth in state personal income for the prior ten fiscal years." LAWS OF 2005, ch. 72, § 4(7) (amending RCW 43.135.025 effective July 1, 2007). The fiscal growth factor adjustment to the state expenditure limit is not material to the matters at issue here.
[17] More precisely, ESSB 6090 section 1701 increased a preexisting transfer from the health services account of $46.25 million by $250 million, for a total transfer of $296.25 million. Laws of 2005, ch. 518, § 1701. As the original $46.25 million transfer is not at issue, and both parties refer to this transaction as the transfer of $250 million, this court will do likewise.
[18] "For transfers in this section to the state general fund, pursuant to [former] RCW 43.135.035(5), the state expenditure limit shall be increased in the amount of the transfer. The increase shall occur in the fiscal year in which the transfer occurs." LAWS of 2005, ch. 518, § 1701 (emphasis added).
[19] Initially, WSFB additionally challenged the validity of Engrossed Senate Bill (ESB) 6096, the estate tax, on the same basis. WSFB voluntarily dismissed this claim when it became clear that the funds generated by ESB 6096 were not subject to the requirements of the TPA because they were dedicated to the education legacy trust account, not the general fund. Laws of 2005, ch. 516.
[20] During discovery, WSFB sought disclosure of many internal government documents that the State claimed were protected by legislative or executive privilege. The trial court ruled that such privileges exist, subject to a list of qualifications. Because we resolve this case in favor of the State, it is unnecessary for us to address this privileges issue, and we decline to do so.
[21] In support of its challenge, the State asserts (1) that the 2006 amendment establishes the fiscal year 2006 expenditure limit, includes in it the disputed $250 million amount, and thereby resolves the case in the State's favor; (2) that ESB 6090 increased the state expenditure limit for fiscal year 2006 by $250 million; (3) that the ELC's November 2005 determination of the fiscal year 2006 expenditure limit must be given effect; and (4) that former RCW 43.135.035(2)(a), by requiring voter approval of future tax increases, violates article II, section 1(b) of the Washington Constitution.
[22] Based on our analysis we need not, and therefore decline to, reach the other issues raised in this case, including (1) the validity of other legislative actions affecting the fiscal year 2006 expenditure limit, as well as the ELC's actions at its November 2005 meeting; (2) the constitutionality of former RCW 43.135.035(2)(a)'s voter approval requirement; and (3) the legislative and executive privileges issue.
[23] The Gruen court noted that "exceptions appear in those cases in which the legislative act is equivalent to a contract." 35 Wash.2d at 54, 211 P.2d 651. This exception does not apply here.
[24] The Washington Constitution imposes a constitutional limitation on the power of future legislatures with respect to laws passed by initiative. See supra note 6.
[25] "`The terms "retroactive" and "retrospective" are synonymous in judicial usage.'" Landgraf v. USI Film Prods., 511 U.S. 244, 269 n. 23, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (quoting 2 NORMAN J. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 41.01, at 337 (5th rev. ed.1993)).
[26] Article II, section 37 provides that "[n]o act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length."
[27] Former RCW 43.135.025 provides:

(5) A state expenditure limit committee is established for the purpose of determining and adjusting the state expenditure limit as provided in this chapter. The members of the state expenditure limit committee are the director of financial management, the attorney general or the attorney general's designee, and the chairs of the senate committee on ways and means and the house of representatives committee on appropriations. All actions of the state expenditure limit committee taken pursuant to this chapter require an affirmative vote of at least three members.
[1] This analysis has been undertaken in greater depth in Richard B. Sanders & Barbara Mahoney, Restoration of Limited State Constitutional Government: A Dissenter's View, 59 N.Y.U. ANN. SURV. AM. L. 269, 280 (2003).
[2] See, e.g., CLEAN v. State, 130 Wash.2d 782, 806, 928 P.2d 1054 (1996), where it is contended even the construction of a baseball stadium is an exercise of the police power. According to Professor Hugh Spitzer, "This broad definition of the police power appears overinclusive and thus not analytically useful." Hugh D. Spitzer, Municipal Police Power in Washington State, 75 WASH. L.REV. 495, 506 (2000).
[3] "Although the constitutional right to bear arms is not unlimited in scope, within its scope that right is absolute." State v. Schelin, 147 Wash.2d 562, 579, 55 P.3d 632 (2002) (Sanders, J., dissenting).
[1] One exception to this general principle is the contracts clause. But outside of the contract context, one legislature lacks the power to bind the hands of future legislatures. CONST. art. I, § 23; see also Kristen L. Fraser, Method, Procedure, Means, and Manner: Washington's Law of Law-Making, 39 GONZ. L.REV. 447, 478 (2003-2004).
[2] Washington State Farm Bureau Federation contends that this portion of ATU is "Obiter Dictum in its Most Gratuitous Form" and should be disregarded, as it is "incidental" to what it deems the holding of the case: that I-695 violates the two subject rule of the state constitution. Resp'ts' Opening Br. on Cross-Appeal and Resp. to State's Opening Br. at 47. Dicta does not work that way, and a case may have more than one holding. In ATU, this court surveyed many independent reasons why I-695 was unconstitutional. We wanted to lay out plainly why I-695 was unconstitutional to guide those who might attempt similar initiatives in the future. We also clearly thought at the time that ATU held more than that. E.g., ATU, 142 Wash.2d at 244, 11 P.3d 762 ("We hold that section 2 of I-695 violates the four percent signature requirement of article II, section 1(b). . . . [and] it changes the way in which a piece of legislation is enacted."). The fact that a court has multiple holdings does not render any of them dicta. See Savage v. Ash, 86 Wash. 43, 46, 149 P. 325 (1915).
[1] The timing of the amendment (it came in the middle of this litigation) is not an issue before us.
[2] Even the pseudonym chosen by the authors of The Federalist, "Publius," supports this point. Publius Valerius was Alexander Hamilton's favorite Roman statesman and one founder of the Roman republic. His alternate name, Publicola, meant "friend of the people," and he earned the title. Publius advocated a republic because the people, not the king, were sovereign. ALBERT FURTWANGLER, THE AUTHORITY OF PUBLIUS-A READING OF THE FEDERALIST PAPERS 51 (1984).