# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE FEB 2 8 2013

Madsen, C.J.

CHIEF JUSTICE

This opinion was filed for record
at _____ on Feb 28, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LEAGUE OF EDUCATION VOTERS, a Washington non-profit corporation; WASHINGTON EDUCATION ASSOCIATION, a Washington non-profit corporation; LAURIE JINKINS, an individual taxpayer and Washington State Representative; DAVID FROCKT, an individual taxpayer and Washington State Senator; JAMIE PEDERSEN, an individual taxpayer and Washington State Representative; ROBERT UTTER, an individual taxpayer and former Chief Justice of the Washington Supreme Court; KIM BIELSKI, an individual taxpayer; ANDY BUNN, an individual taxpayer; REBECCA BUNN, an individual taxpayer; REUVEN CARLYLE, an individual taxpayer and Washington State Representative; JOHN CHESBROUGH, an individual taxpayer; DEB EDDY, an individual taxpayer and Washington State Representative; SAM HUNT, an individual taxpayer and Washington State Representative; AMY MCKENNEY, an individual taxpayer; KURT MILLER, an individual taxpayer and President of the Tacoma Public Schools Board of Directors; JIM MOELLER, an individual taxpayer and Washington State Representative; TIMM ORMSBY, an individual taxpayer and Washington State Representative; RYAN PAINTER, an individual taxpayer; ERIC PETTIGREW, an individual taxpayer and Washington State Representative; CHRIS REYKDAL, an individual taxpayer, Washington State Representative and Tumwater School Board Member; CINDY RYU, an individual taxpayer and Washington State Representative; MIKE SELLS, an individual taxpayer and Washington State Representative; and KRISTIN SKANDERUP, an individual taxpayer, <br><br> Respondents, <br><br> v. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 87425-5 <br><br> En Banc <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> Filed     FEB 2 8 2013 |

STATE OF WASHINGTON,                               )
                                                   )
       Appellant,                               )
                                                   )
CHRISTINE GREGOIRE, in her official capacity as    )
Governor of the State of Washington,               )
                                                   )
       Respondent.                               )
_____)

  OWENS, J. -- Before us is a constitutional challenge to two provisions of voter-enacted former RCW 43.135.034 (2011) (Initiative 1053 (I-1053)). The first provision requires that any bill containing a tax increase be passed by a two-thirds majority vote of the legislature (Supermajority Requirement), and the second provision requires that any tax bill increasing spending beyond the state spending limit be approved by the voters (Referendum Requirement). At the outset, we note that our opinion does not reflect whether these provisions embody sound policies. We agree with the dissenting justices that such judgment is reserved for the people and the legislature. However, as Chief Justice John Marshall wrote, "[I]f both the law and the constitution apply to a particular case, . . . the court must determine which of these conflicting rules governs the case." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177-78, 2 L. Ed. 60 (1803). We meet that task today by addressing only whether the challenges to the two provisions are justiciable and whether the challenged provisions violate the Washington Constitution. The King County Superior Court found the challenge to both provisions justiciable and held that the Supermajority Requirement

violated article II, section 22 and the Referendum Requirement violated article II, section 1(b). The State appealed, contending this dispute is nonjusticiable and that both provisions of former RCW 43.135.034 are constitutional.

We affirm the trial court in part and reverse in part. We affirm the trial court's decision regarding the justiciability and the constitutionality of the Supermajority Requirement. Article II, section 22 states that "[n]o bill shall become a law unless . . . a majority of the members elected to each house" vote in its favor. The plain language, constitutional history, and weight of persuasive authority support reading this provision as setting both a minimum and a maximum voting requirement. Therefore, the Supermajority Requirement violates article II, section 22 by requiring certain legislation to receive a two-thirds vote. However, we reverse the trial court's decision that the Referendum Requirement presents a justiciable controversy. Because the Referendum Requirement is not justiciable, we make no determination as to its constitutionality.

## STATEMENT OF FACTS

In 2010, voters passed I-1053, which is codified at former RCW 43.135.034. LAWS OF 2011, ch. 1, § 2. Former RCW 43.135.034 was another iteration of a long line of initiatives that have established two requirements for certain tax legislation: the Supermajority Requirement and the Referendum Requirement.

A rich litigious history surrounds both the Supermajority Requirement and the Referendum Requirement. These requirements were first imposed by Initiative 601 (I-601), which was approved by the voters in 1993. LAWS OF 1994, ch. 2. Before the initiative went into effect, a group of legislators, public advocacy groups, and citizens sought a writ of mandamus in this court ordering the legislature to prevent I-601's implementation, claiming it was unconstitutional. *Walker v. Munro*, 124 Wn.2d 402, 406-07, 879 P.2d 920 (1994). The court dismissed the dispute, refusing to use mandamus to compel legislative officers to perform discretionary acts or duties like determining whether I-601 applied to a particular bill. *Id.* at 410.

I-601 remained in effect for several years until the legislature suspended it for two years in 2005. *Brown v. Owen*, 165 Wn.2d 706, 713, 206 P.3d 310 (2009).[1] Then in 2007, voters passed Initiative 960 (I-960). *Id.* I-960, like I-601 before it, contained a Supermajority Requirement and a Referendum Requirement. *Id.* at 714. I-960 spawned two separate cases. First, a group of challengers sought to prevent the secretary of state from even placing I-960 on the ballot. *Futurewise v. Reed*, 161 Wn.2d 407, 408, 166 P.3d 708 (2007). This court dismissed the action as nonjusticiable because the dispute did not fit the narrow requirements for challenging initiatives preelection. *Id.* at 415. The second case arose postenactment. There, a

---

[1] The legislature is ordinarily required to wait at least two years before amending any initiative unless two-thirds of the legislature approves amending the initiative sooner. WASH. CONST. art. II, § 41.

state senator sought a writ of mandamus in this court to force the senate president to forward a tax bill to the house of representatives that received only a simple majority in the senate. *Brown*, 165 Wn.2d at 711, 716. The court again did not address the constitutionality of the Supermajority Requirement because the case raised a nonjusticiable political question. *Id.* at 727.

The legislature suspended I-960 after two years, just as it had suspended I-601. LAWS OF 2010, ch. 4. Knowing such a suspension was a possibility, voters passed I-1053 in 2010, which again contained the Supermajority Requirement and the Referendum Requirement and prevented the legislature from suspending the requirements for another two years. Sponsors also filed Initiative 1185 (I-1185) for the 2012 ballot, which again contained these two requirements. LAWS OF 2013, ch. 1. Voters passed I-1185.

PROCEDURAL HISTORY

In July 2011, respondents—the League of Education Voters (LEV), Washington Education Association (WEA), 12 individual legislators, and numerous individual taxpayers (hereinafter collectively referred to as "LEV" unless otherwise noted)—filed a complaint in King County Superior Court seeking a declaratory judgment that the Supermajority Requirement and Referendum Requirement violated article II, section 22 and article II, section 1(b) of the Washington Constitution. LEV

filed its complaint only after the attorney general refused to challenge the constitutionality of former RCW 43.135.034.

The parties filed cross motions for summary judgment in January 2012, and Governor Gregoire filed a brief requesting a decision on the merits, although she expressed no view on the merits of the dispute. After oral argument, the trial court granted LEV's motion for summary judgment, holding that (1) the dispute was justiciable; (2) the dispute constituted a matter of great public importance; (3) article II, section 22 prohibited the Supermajority Requirement; and (4) article II, section 1(b) prohibited the Referendum Requirement.

The State then appealed directly to this court. We accepted direct review.

## ISSUES

1. Are the constitutional challenges to the Supermajority Requirement and the Referendum Requirement justiciable?

2. If justiciable, is the Supermajority Requirement constitutional under article II, section 22 and is the Referendum Requirement constitutional under article II, section 1(b)?

3. Is the Supermajority Requirement or the Referendum Requirement severable from former RCW 43.135.034?

ANALYSIS

I.     Justiciability

We must first determine whether LEV's constitutional challenges to the Supermajority Requirement and the Referendum Requirement constitute justiciable controversies. We conclude that the Supermajority Requirement's constitutionality is justiciable because the requirement has nullified the legislator respondents' votes by preventing the passage of tax legislation that received a simple majority vote. However, the constitutionality of the Referendum Requirement is not justiciable given the hypothetical nature of the claim and the lack of injury.

Under the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, courts have the "power to declare rights, status and other legal relations" by a declaratory judgment. RCW 7.24.010. Unless a dispute involves "issues of major public importance, a justiciable controversy must exist before a court's jurisdiction may be invoked under the [UDJA]." *Nollette v. Christianson*, 115 Wn.2d 594, 598, 800 P.2d 359 (1990). A justiciable controversy requires

> "(1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."

*To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 411, 27 P.3d 1149 (2001) (alteration

in original) (quoting *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514

P.2d 137 (1973)).[2]

Here, there is little question that the constitutionality of the Supermajority

Requirement constitutes a justiciable controversy. To satisfy the justiciable

controversy requirement, LEV points to the failed passage of Substitute House Bill

2078, 62d Leg., 1st Spec. Sess. (Wash. 2011) (SHB 2078), as a concrete example of

the Supermajority Requirement's impact. SHB 2078 would have funded a reduction

in kindergarten through third grade class sizes by closing tax loopholes. Closing tax

loopholes constitutes a tax increase subject to the Supermajority Requirement. *See*

former RCW 43.135.034(1), (6). As a result of triggering the Supermajority

Requirement, SHB 2078 failed to pass the house even though it received a simple

majority of votes.

In his dissent, Justice Charles Johnson claims that the "essence" of SHB 2078

was passed in Engrossed Senate Bill 6635, 62d Leg., 2d Spec. Sess. (Wash. 2012)

(ESB 6635). Dissent (C. Johnson, J.) at 3. While ESB 6635 certainly closed the same

tax loophole as SHB 2078, ESB 6635 differed substantially in that it did not fund a

reduction in school class sizes. *Compare* ESB 6635, *with* SHB 2078, at 4; Clerk's

---

[2] As with any discussion of justiciability, some of the concepts discussed are similar in nature to a discussion of standing. *See Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 203, 11 P.3d 762, 27 P.3d 608 (2000).

Papers (CP) at 672-94. Moreover, ESB 6635 created four new tax loopholes, thus reducing the overall revenue generated by the bill. *Compare* ESB 6635, at 4-44, *with* SHB 2078; CP at 672-94. Accordingly, the dissent's claim that ESB 6635 contained the "essence" of SHB 2078 is inaccurate.

The failed passage of SHB 2078 satisfies the four elements of a justiciable controversy. The legislator respondents "have a plain, direct and adequate interest in maintaining the effectiveness of their votes." *Coleman v. Miller*, 307 U.S. 433, 438, 59 S. Ct. 972, 83 L. Ed. 1385 (1939).[3] The legislator respondents' interest in maintaining the effectiveness of their votes was harmed by the Supermajority Requirement when a bill they voted for failed to pass despite receiving a simple majority. "[L]egislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines v. Byrd*, 521 U.S. 811, 823, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997).[4] The specific example of SHB 2078 moves the legislator respondents' claim from the realm of abstract diluted legislative power to the realm of actual vote nullification. Consequently, there is an actual dispute between the State and LEV.

---

[3] As the legislator respondents may properly bring this dispute, we need not consider whether the other respondents may as well. *See Bowsher v. Synar*, 478 U.S. 714, 721, 106 S. Ct. 3181, 92 L. Ed. 2d 583 (1986) (reasoning that the presence of one party with standing satisfies the jurisdictional requirement).

[4] Because SHB 2078 and ESB 6635 are substantially different bills, the factual basis for Justice C. Johnson's analysis of *Raines* is inapposite.

Finally, neither party disputes that a determination from this court will be final and conclusive. Thus, the failed passage of SHB 2078 demonstrates that the Supermajority Requirement's constitutionality presents a justiciable controversy.[5]

Further, we note that the State's position would effectively insulate the Supermajority Requirement from review. Under the State's theory, review would be proper only if the legislature ignored the Supermajority Requirement and passed a tax bill without a two-thirds majority vote. The State's position, however, would require the legislature to ignore the well-established principle that statutes are presumed constitutional, *Island County v. State*, 135 Wn.2d 141, 146, 955 P.2d 377 (1998). Given that the legislator respondents cannot ignore the Supermajority Requirement without violating their obligation to uphold the laws of the state, the State's position would render the Supermajority Requirement unreviewable and is therefore unacceptable.

The State also argues that the court should dismiss this action as nonjusticiable because it dismissed similar disputes in three prior decisions—*Walker*, *Brown*, and *Futurewise*. This argument ignores the fundamental procedural distinctions between those cases and this one. Both *Walker* and *Brown* involved mandamus actions filed directly with this court, which differ greatly from the declaratory judgment action filed in superior court in this case. *See Walker*, 124 Wn.2d at 405; *Brown*, 165 Wn.2d

---

[5] Having concluded that the dispute is justiciable, we decline to address whether the dispute constitutes a matter of great public importance warranting review.

at 711. And, in *Futurewise*, the preelection challenge to an initiative's constitutionality at issue was nonjusticiable because it did not meet the stringent requirements for a preelection challenge. 161 Wn.2d at 411-12. Consequently, the fact that we have been unable to address the merits of the Supermajority Requirement previously does not inform the current discussion. The Supermajority Requirement's constitutionality is properly before us.

In contrast, LEV's challenge to the Referendum Requirement is not justiciable. Unlike the Supermajority Requirement, the Referendum Requirement has not harmed any of the respondents. The legislator respondents do not claim it has nullified their votes, nor do any of the other respondents claim harm from the Referendum Requirement. Without identifying a legal interest at issue, let alone an injury to that interest, LEV cannot establish a justiciable controversy. *See To-Ro Trade Shows*, 144 Wn.2d at 411-14. The circumstances surrounding the Referendum Requirement have not changed since we stated in *Walker* that addressing the requirement is premature. 124 Wn.2d at 413.

> Perhaps the Legislature can comply with [the Supermajority Requirement], without taking action which will result in expenditures over the expenditure limit, such that no referral to the voters will occur under [the Referendum Requirement] . . . . The course of future events is, at this time, purely speculative and subject to a challenge when a specific dispute arises in regard to a particular bill.

*Id.*

Even though there is no identifiable legal interest harmed by the Referendum Requirement or specific dispute, LEV believes its challenge to the Referendum Requirement is justiciable because this court declared a similar provision unconstitutional in *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 244, 11 P.3d 762, 27 P.3d 608 (2000) (*ATU*). *ATU*, however, does not inform the current discussion because justiciability was explicitly not considered in *ATU*. *Id.* at 203. The court refused to consider whether the dispute was justiciable because the party challenging justiciability had failed to properly brief the issue. *Id.* Granted, we noted in a footnote that the claims in the case were justiciable, *id.* at 203 n.4, but the footnote was merely dicta. Justiciability was properly briefed in this case, and LEV's challenge to the Referendum Requirement is not justiciable because no legal interest has been identified.

We also note that the Referendum Requirement does not constitute a matter of major public importance warranting review under these circumstances. For the public importance exception to apply, the dispute must be ripe, *Walker*, 124 Wn.2d at 414, and, as discussed above, the Referendum Requirement has never been triggered or otherwise affected any legal interests. Accordingly, the constitutionality of the Referendum Requirement is not properly before this court.

II.     Whether the Supermajority Requirement Violates Article II, Section 22

The central question remaining before us is whether former RCW 43.135.034(1), the Supermajority Requirement, is constitutional. The party challenging a statute's constitutionality "must prove that the statute is unconstitutional beyond a reasonable doubt." *Sch. Dists.' Alliance for Adequate Funding of Special Educ. v. State*, 170 Wn.2d 599, 605, 244 P.3d 1 (2010). This court has consistently stated that "'the legislature's power to enact a statute is unrestrained except where, either expressly or by fair inference, it is prohibited by the state and federal constitutions.'" *Wash. State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 300-01, 174 P.3d 1142 (2007) (alteration omitted) (quoting *State ex rel. Citizens Against Tolls v. Murphy*, 151 Wn.2d 226, 248, 88 P.3d 375 (2004)). Thus, the question before us is whether article II, section 22 prohibits the legislature from requiring a two-thirds majority vote for tax legislation. We conclude that it does.

Determining whether the constitution prohibits a particular legislative action requires the court to first examine the plain language of the constitutional provision at issue. *Wash. Water Jet Workers Ass'n v. Yarbrough*, 151 Wn.2d 470, 477, 90 P.3d 42 (2004). The court gives the words "their common and ordinary meaning, as determined at the time they were drafted." *Id.* (citing *State ex rel. O'Connell v. Slavin*, 75 Wn.2d 554, 557, 452 P.2d 943 (1969)). The court may look to the constitutional history for context if there is ambiguity. *Id.* In this particular case, the

historical context necessarily includes other provisions adopted contemporaneously with article II, section 22.

The plain language of article II, section 22 states in relevant part, "No bill shall become a law unless on its final passage . . . a majority of the members elected to each house be recorded thereon as voting in its favor." By providing the words their ordinary meaning near the time of ratification, the provision essentially states that a bill cannot become a law upon any condition less than receiving more than half the vote. WEBSTER'S INTERNATIONAL DICTIONARY 1578 (1899) (defining "unless" as "[u]pon any less condition than . . . ; if not"); *id.* at 885 (defining "majority" as "[t]he greater number ; more than half"). In other words, if a bill has become law, then it must have been supported by a simple majority vote.

Under a commonsense understanding, any bill receiving a simple majority vote will become law. No language in the provision qualifies that requirement by stating a bill needs "at least a majority vote." The court's decision in *Gerberding v. Munro*, 134 Wn.2d 188, 207-11, 949 P.2d 1366 (1998), supports such a reading. In *Gerberding*, this court rejected the argument that a negatively phrased constitutional provision merely sets a minimum requirement to which the legislature may add. *Id.* The court held that two constitutional provisions established the exclusive constitutional qualifications for state constitutional officers. *Id.* Despite the

provisions' negative phrasing,[6] the court held that the legislature could not impose additional requirements, such as term limits. *Id.* at 210. In reaching its decision, the court relied on a principle favoring eligibility for office—a principle not evident from the plain language of the provision—and the framers' explicit consideration and rejection of term limits for the officers at issue. *Id.* at 202-04, 210.

*Gerberding* can be contrasted with *Robb v. City of Tacoma*, 175 Wash. 580, 587, 28 P.2d 327 (1933), where the court allowed the legislature to add requirements to a negatively phrased constitutional provision governing municipal debt. Article VIII, section 6 provided, "'No [municipality] shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum . . . without the assent of three-fifths of the voters . . . . Provided further, that any [municipality], with such assent, *may be allowed* to become indebted to a larger amount.'" *Id.* at 584 (emphasis added) (quoting WASH. CONST. art. VIII, § 6). The court focused on the permissive language in the final proviso and found it "carrie[d] a very positive implication that the legislature still has the power to fix an additional limitation." *Id.* at 587.

The State primarily relies on the negative phrasing of article II, section 22, and the reasoning in *Robb*, to claim the provision sets a minimum voting requirement

---

[6] The provisions stated, "*No person shall be eligible* to the legislature *who shall not be* a citizen of the United States and a qualified voter in the district for which he is chosen" and "*No person, except a citizen* of the United States . . . *shall be eligible* to hold any state office." WASH. CONST. art. II, § 7 (emphasis added), art. III, § 25 (emphasis added).

only. Article II, section 22, however, is more like the provision in *Gerberding* than the provision in *Robb*. As in *Gerberding*, where a principle favored the result, there is an informal principle here favoring a simple majority vote for ordinary legislation. Additionally, like the constitutional history in *Gerberding* that supported the outcome, the constitutional language and history in this case illustrates that the framers never intended ordinary legislation to require a supermajority vote.

This dispute also raises constitutional concerns not at issue in either *Gerberding* or *Robb*—the very form and function of this state's government. The language and history of the constitution evince a principle favoring a simple majority vote for legislation. The State's proposed reading of article II, section 22 would fundamentally alter our system of government, and such alteration is possible only through constitutional amendment. Washington's government was founded as a representative democracy based on simple majority rule. *See* WASH. CONST. art. II, § 1 (orig. text) ("The legislative powers shall be vested in a senate and house of representatives."), art. II, § 22; Kristen L. Fraser, *Method, Procedure, Means, and Manner: Washington's Law of Law-Making*, 39 GONZ. L. REV. 447, 449-50, 480 (2004) (noting that a simple majority is "the number of votes ordinarily required to pass a bill"). More importantly, the framers were particularly concerned with a tyranny of the minority. Fraser, *supra*, at 449-50 (noting that the framers feared "special interests that might capture or corrupt public institutions"); *see also* ROBERT

F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A

REFERENCE GUIDE 51 (G. Alan Tarr ed., 2002).

This preference for simple majority rule is evident from the very language of

the constitution, which required only a simple majority vote for ordinary legislation

and reserved a supermajority vote for special circumstances. The seven supermajority

requirements in the original constitution were all relegated to special circumstances,

not the passage of ordinary legislation.[7] These circumstances included expelling a

member of the legislature or overriding a veto. WASH. CONST. art. II, § 9, art. III, §

12. Thus, the framers were aware of the significance that a supermajority vote

requirement entailed and consciously limited it to special circumstances; the passage

of ordinary legislation is not one of those.

When debating article II, section 22, the framers specifically included the

majority vote requirement. THE JOURNAL OF THE WASHINGTON STATE

CONSTITUTIONAL CONVENTION 1889: WITH ANALYTICAL INDEX 535-36 (Beverly

Paulik Rosenow ed., 1999). More to the point, the framers rejected a move to exclude

the words "majority vote." *Id.* at 536. They also rejected a motion to allow a majority

of those present to pass a bill. *Id.* There was no discussion of whether the legislature

should be allowed to alter this requirement. Had the framers wished to give the

legislature the ability to alter the majority vote requirement of article II, section 22,

---

[7] WASH. CONST. art. II, §§ 9, 36, art. III, § 12, art. IV, § 9, art. V, § 1, art. XXIII, §§ 1, 2.

they could easily have included the proviso "and under such rules as the legislature shall prescribe" as the framers did in article II, section 32. The existence of the proviso in article II, section 32—also framed in the negative—illustrates that the framers intended the provisions in article II to be exhaustive unless otherwise provided. Any other reading would render the proviso in section 32 superfluous, contrary to our canons of constitutional interpretation. *Wash. Econ. Dev. Fin. Auth. v. Grimm*, 119 Wn.2d 738, 746, 837 P.2d 606 (1992) ("constitutional provisions should be construed so that no clause . . . shall be superfluous").

Moreover, as mentioned above, allowing a supermajority requirement for ordinary legislation alters our system of government. The framers of the United States Constitution expressed as much in the *Federalist* papers:

> If a pertinacious minority can controul the opinion of a majority respecting the best mode of conducting it; the majority in order that something may be done, must conform to the views of the minority; and thus the sense of the smaller number will over-rule that of the greater.

THE FEDERALIST NO. 22, at 141 (Alexander Hamilton) (Jacob E. Cooke ed., 1961); *accord* THE FEDERALIST NO. 58 (James Madison). In the same way, a supermajority requirement for ordinary legislation would allow special interests to control resulting legislation. While the current Supermajority Requirement applies only to tax increases, if carried to its logical conclusion, the State's argument could allow all legislation to be conditioned on a supermajority vote. In other words, under the State's reasoning, a simple majority of the people or the legislature could require

18

particular bills to receive 90 percent approval rather than just a two-thirds approval, thus essentially ensuring that those types of bills would never pass. Such a result is antithetical to the notion of a functioning government and should be rejected as such. *Cf. ATU*, 142 Wn.2d at 242 (rejecting an argument because "[s]uch a result would be inconsistent with the representative form of government in this state").

Finally, analogous authority from other states supports reading article II, section 22 as establishing both a minimum and a maximum vote requirement. Although the State argues the court should not consider authority from other states, we follow the precedent of both *Gerberding* and *Robb* where the court looked to such authority before reaching its conclusion. *Gerberding*, 134 Wn.2d at 206-08; *Robb*, 175 Wash. at 588-92.

The most analogous case, *Alaskans for Efficient Government, Inc. v. State*, held that a negatively phrased constitutional provision prohibited the legislature from requiring more than a simple majority vote for bills. 153 P.3d 296, 299, 302 (Alaska 2007). The court noted that the negative phrasing of a constitutional provision does not automatically warrant distinguishing it from positively phrased provisions. *Id.* at 300-01 (citing *Powell v. McCormack*, 395 U.S. 486, 538-39, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969); *Gerberding*, 134 Wn.2d at 201-03; *Cathcart v. Meyer*, 2004 WY 49, 88 P.3d 1050, 1070-71). The court also noted that every other state, except for Washington, that has passed a supermajority vote requirement has done so through

constitutional amendment, thus indicating it is a subject properly addressed by constitutional amendment, not legislation. *Id.* at 299-300 & n.12 (listing 13 states that have adopted supermajority requirements through constitutional amendment).

Additional support is found in a California Court of Appeal case. The court held that a negatively phrased constitutional provision prevented local governments from requiring a two-thirds majority vote for local tax legislation. *Howard Jarvis Taxpayers Ass'n v. City of San Diego*, 120 Cal. App. 4th 374, 392, 15 Cal. Rptr. 3d 457 (2004). Although the case involved local government authority, the court still addressed whether a negatively phrased constitutional provision could prohibit requiring more than simple majority vote for the passage of certain legislation. The court concluded that the "constitutional language clearly and unambiguously . . . requires only a majority vote, and a two-thirds vote cannot be required." *Id.*

Ultimately, article II, section 22 requires that bills receive a majority vote before they can become a law. Article II, section 22 is exhaustive under an ordinary reading of the provision. The Supermajority Requirement unconstitutionally amends the constitution by imposing a two-thirds vote requirement for tax legislation. More importantly, the Supermajority Requirement substantially alters our system of government, thus enabling a tyranny of the minority. The framers were aware of the extraordinary nature of a supermajority requirement as evidenced by their decision to use it only under special circumstances. The passage of ordinary legislation is not one

of those circumstances. If the people and the legislature wish to adopt such a requirement, they must do so through constitutional amendment. We also note that our holding is supported by other jurisdictions that have addressed this issue. Accordingly, we affirm the trial court's decision.

III.    Severability

Next, we must determine whether the unconstitutional Supermajority Requirement is severable from the remaining provisions of former RCW 43.135.034. Whether provisions should be severed depends on

> "whether the constitutional and unconstitutional provisions are so connected . . . that it could not be believed that the legislature would have passed one without the other; or where the part eliminated is so intimately connected with the balance of the act as to make it useless to accomplish the purposes of the legislature."

*State v. Abrams*, 163 Wn.2d 277, 285-86, 178 P.3d 1021 (2008) (alteration in original) (internal quotation marks omitted) (quoting *Hall v. Niemer*, 97 Wn.2d 574, 582, 649 P.2d 98 (1982)). Because former RCW 43.135.034 was passed by initiative, we must determine if the voters, not the legislature, intended severability. *See McGowan v. State*, 148 Wn.2d 278, 296, 60 P.3d 67 (2002).

Here, the complete text of I-1053 contained a severability clause stating, "If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of the provision to other persons or circumstances is not affected." LAWS OF 2011, ch. 1, § 7. Where the initiative passed

by the people contains a severability clause, the court may view this as "'conclusive as to the circumstances asserted' unless it can be said that the declaration is obviously false on its face." *McGowan*, 148 Wn.2d at 296 (quoting *State v. Anderson*, 81 Wn.2d 234, 239, 501 P.2d 184 (1972)). LEV claims it is obviously false because the intent of the initiative was to impose both the Supermajority Requirement and the Referendum Requirement.

However, the fact that voters intended to impose both requirements is inconsequential. Anytime a bill or initiative contains multiple provisions, it can be argued that the legislators or voters intended to pass multiple provisions. Whether those provisions were intended to be severable is a different inquiry. More importantly, the voters intended the initiative to make passing tax increases more difficult. LAWS OF 2011, ch. 1, § 1 ("These important policies ensure that taking more of the people's money will always be an absolute last resort."). The Referendum Requirement hinders the legislature's ability to pass tax increases in a different way from the Supermajority Requirement. Thus, the Referendum Requirement serves the voters' intent even absent the Supermajority Requirement. There is no reason to believe the voters passed the Referendum Requirement only because it was accompanied by the Supermajority Requirement. Consequently, the unconstitutional Supermajority Requirement is severable from the remainder of the statute and the Referendum Requirement stands.

CONCLUSION

As Justice Robert F. Utter affirmed, "Both history and uncontradicted authority make clear that "'[i]t is emphatically the province and duty of the judicial department to say what the law is.""" *In re Salary of Juvenile Dir.*, 87 Wn.2d 232, 241, 552 P.2d 163 (1976) (alteration in original) (quoting *United States v. Nixon*, 418 U.S. 683, 703, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974) (quoting *Marbury*, 5 U.S. (1 Cranch) at 176)). Today we hold that article II, section 22 prohibits either the people or the legislature from passing legislation requiring more than a simple majority for the passage of tax legislation—or any other ordinary legislation. Such a result is supported by article II, section 22's plain language and the language from surrounding provisions, section 22's history, and current case law. Accordingly, we affirm the trial court's decision with respect to the Supermajority Requirement. But we reverse the trial court's decision as it relates to the Referendum Requirement because we hold the dispute is not justiciable. We therefore do not reach the merits of the Referendum Requirement's constitutionality.

Our holding today is not a judgment on the wisdom of requiring a supermajority for the passage of tax legislation. Such judgment is left to the legislative branch of our government. Should the people and the legislature still wish to require a supermajority vote for tax legislation, they must do so through constitutional amendment, not through legislation.

_Owens, J._

WE CONCUR:

_Madsen, C.J._

_Chambers, P.T._

_Fairhurst, J._

_Wiggins, J._

_González, J._

*League of Education Voters v. State*
Dissent by C. Johnson, J.

No. 87425-5

C. JOHNSON, J. (dissenting)—In its eagerness to embroil itself in the political arena, the majority abandons any semblance of judicial restraint to declare the process of legislative enactment constitutionally infirm. For the past two decades, the people of this state have repeatedly voted for the supermajority provision, as has the legislature when no initiative occurred. The majority hardly recognizes, let alone analyzes, that this court has been repeatedly asked to step in and decide this issue, and we have consistently held and rejected that invitation. In *Walker v. Munro*, 124 Wn.2d 402, 879 P.2d 920 (1994), in *Futurewise v. Reed*, 161 Wn.2d 407, 166 P.3d 708 (2007), and again in *Brown v. Owen*, 165 Wn.2d 706, 206 P.3d 310 (2009), we rejected the invitation to engage in this political dispute, exercising the wisdom, restraint, and temperance not to step outside the court's constitutional authority. Evidently something has changed, though the majority does not tell us what, to cause it to abandon these limiting principles and chart a new course for the court to more actively engage in the political process. This change is both unwise and unprecedented.

The majority summarily claims that since, procedurally, this case involves review of a declaratory judgment that makes a difference. But this procedural distinction does not make sense and is unsupported by any logical analysis. Justiciability questions are broader and more important than the specific mechanism used to get a case in front of the court. Surely more than this distinction is required to disregard 20 years of precedent. The majority does not tell us why in this case the issue must suddenly be answered when, in our prior cases, addressing this exact issue, we concluded that any resolution of the dispute required a legislative solution. Concepts of judicial restraint, justiciability, and separation of powers and issues raising political questions do not change based on the type of proceeding.

Although these doctrines do somewhat overlap, they have been applied in those cases where the issue raised required a determination of whether and when courts should decide an issue. These concepts of judicial restraint are not new or remarkable and have been applied consistently in cases raising the exact same issue presented here.

The majority anchors its cursory analysis of justiciability by focusing on Substitute House Bill (SHB) 2078's failure to pass. SUBSTITUTE H.B. 2078, 62d Leg., 1st Spec. Sess. (Wash. 2011). However, the bill focused on by the majority

was later largely passed through the legislative process and enacted into law. SHB 2078 dealt with closing certain tax loopholes. The problem with the majority's assertion is that a core component of SHB 2078 did pass. The legislature instead enacted Engrossed Senate Bill (ESB) 6635, 62d Leg., 2d Spec. Sess. (Wash. 2012), which, in substantive effect, contained the exact language of SHB 2078. *Compare* SHB 2078, § 2(3)(a)-(e), *with* ESB 6635, § 102(3)(a)-(e). The majority does not explain, presumably because no credible explanation exists, how the enactment of a law supports its conclusion that the political process in that enactment is constitutionally infirm.

When this bill was first proposed, the house majority vote to enact SHB 2078 could have resulted in several outcomes, as is always the political reality. The speaker could have ruled it passed, and it then would go to the senate, which could have passed it, rejected it, or revised it. If it passed both the house and the senate and was submitted to the governor, it could have been signed into law or vetoed. No certainty exists as to what ultimately would have occurred in the political legislative process had the speaker ruled "favorably." What did happen in this case is that the "essence" of SHB 2078 went through the legislative process and was later enacted as part of ESB 6635. The majority does not tell us or acknowledge in any way how the *passage* of these provisions can support a finding

3

of justiciability based on the same provisions' failure to pass. At the very least, that passage moots any dispute concerning how votes were counted or how the speaker ruled on SHB 2078.

The legislative process works precisely this way, and any disgruntled legislator can pursue a legislative remedy. When the speaker ruled against the bill, a member could have challenged that decision and ask that it be overturned, which may require majority vote. The proposal could have, as here, resurfaced as part of a different proposal. The proposal might have been relegated by its sponsors into the political process and debate and prioritized as part of that process. The point is that this effort to enact a legislative proposal has consistently been recognized by this court as a political legislative action, in which courts have not interfered, nor should they. Because of the multitude of possible outcomes, the essence of the political legislative process involves many competing political choices into which courts should not intrude to act as referee. It should be further noted that the majority's decision does absolutely nothing that affects SHB 2078, which, as indicated, later passed.

In leaping to its result that the case is justiciable, the majority incredibly cites the "completely nullified" statement from the United States Supreme Court decision in *Raines v. Byrd*, 521 U.S. 811, 823, 117 S. Ct. 2312, 138 L. Ed. 2d 849

4

(1997). Because the bill was enacted, the majority's claim is simply wrong that the legislators' votes were "'completely nullified.'" Majority at 9 (quoting *Raines*, 521 U.S. at 823). Moreover, the majority does not acknowledge that in *Raines* the United States Supreme Court rejected this argument. *Raines* involved a challenge brought by members of Congress claiming the line-item veto, which gave the president a "veto-type" power over acts passed by Congress, effectuated a complete nullification of the votes supporting passage of those acts. In concluding that the Court lacked jurisdiction to decide the dispute, it recognized two principles that directly apply to the individual legislators here. First, the Court found that the individual members of Congress could not represent the interests of Congress itself. Second, the court recognized that, as here, an adequate political remedy existed to resolve the dispute, a principle which our cases have consistently held. *Raines*, 521 U.S. at 824, 829; *see Brown*, 165 Wn.2d 706; *Walker*, 124 Wn.2d 402. The majority misrepresents the holding of *Raines*, which, if thoroughly reviewed, rejects the majority's position here.

Similarly, the majority's claim that the determination of justiciability hinges on the nature of the proceedings, declaratory action versus original jurisdiction, lacks foundation and misunderstands the concept of justiciability. "Justiciability" is defined as "[t]he quality or state of being appropriate or suitable for adjudication

by a court." BLACK'S LAW DICTIONARY 943 (9th ed. 2009). In determining justiciability, it makes no difference where or how a claim is instituted. Our prior cases do not support any distinction, and the majority (absent the bare assertion that a distinction exists) cites no case or authority where such a difference was recognized. No such cases exist.

If the issue in this case looks somewhat familiar, we recently decided this exact issue. In *Brown*, we rejected a challenge to a decision made by the lieutenant governor that a bill failed to pass by not receiving the required supermajority vote, which is the precise claim brought here. We extensively discussed and analyzed the history of the supermajority requirement. In that case we recognized that, under the senate rules, the decision could have been overruled by a simple majority vote. We correctly found that this type of dispute involved the legislative process and was a political question and, utilizing a separation of powers analysis, we would not intervene to referee. We have consistently and wisely embraced this approach since this supermajority restriction was first challenged in *Walker*. The majority makes no meaningful attempt to discuss, analyze, or distinguish the *Brown* case or any of our prior case holdings from the issue again raised here.

In addition to the comprehensive discussion and analysis in *Brown*, our rulings have been consistent on this issue. The list of cases includes *Walker* and

*Washington State Farm Bureau Federation v. Gregoire*, 162 Wn.2d 284, 174 P.3d 1142 (2007). These cases are not unique but are instead consistent with the results in many other cases. *State v. Manussier*, 129 Wn.2d 652, 670, 921 P.2d 473 (1996) (political questions are not within the judicial power to determine); *Roehl v. Pub. Util. Dist. No. 1 of Chelan County*, 43 Wn.2d 214, 238, 261 P.2d 92 (1953) (political questions lie outside the cognizance of the judiciary); *see also Gilbreath v. Pac. Coast Coal & Oil Co.*, 75 Wn.2d 255, 259, 450 P.2d 173 (1969) (taxation issues are not within the purview of the courts in the absence of an attack upon the constitutionality of the legislation involved); *Skidmore v. Fuller*, 59 Wn.2d 818, 822, 370 P.2d 975 (1962) (the truth or falsity of the allegations in a recall demand is a political question to be determined by the voters); *Capitol Hill Methodist Church v. City of Seattle*, 52 Wn.2d 359, 368, 324 P.2d 1113 (1958) (the power to vacate streets is a political function, which, in the absence of collusion, fraud, or interference with a vested right, will not be judicially reviewed); *State ex rel. Donohue v. Coe*, 49 Wn.2d 410, 417, 302 P.2d 202 (1956) (determination of questions arising incidental to the submission of an initiative measure to the voters is a political and not a judicial question, except when there may be express statutory or written constitutional law making the question judicial); *State ex rel. York v. Bd. of Comm'rs*, 28 Wn.2d 891, 911, 184 P.2d 577 (1947) (protection of

7

the public from unreasonable uses of the highways is a political question, not a judicial one). The majority never mentions these cases or acknowledges why these holdings are being abandoned.

The majority also fails to apply or meaningfully analyze the factors our cases require when determining justiciability. We have defined a "justiciability controversy" as

"(1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."

*To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 411, 27 P.3d 1149 (2001) (alteration in original) (quoting *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973)). We have elaborated that "the four justiciability factors must 'coalesce' to ensure that the court will be rendering a final judgment on an actual dispute between opposing parties with a genuine stake in the resolution." *To-Ro Trade Shows*, 144 Wn.2d at 411 (quoting *Diversified Indus. Dev. Corp.*, 82 Wn.2d at 815). None of the factors are satisfied here. As indicated, the first factor is not satisfied because the dispute over SHB 2078 no longer exists

as it later passed under ESB 6635 and became law. Any current dispute is hypothetical at this time and certainly moot as to SHB 2078.

As to the second factor, perhaps an argument can be envisioned that the parties have opposing interests, but no genuine dispute actually exists concerning a current situation. Any disagreement between the parties involves what might possibly occur in the future in the legislative process. Because of this, even assuming the second factor is satisfied, the third factor is not because we can only speculate as to what bills may be pursued sometime in the future. Based on these factors, justiciable controversy does not exist in this case.

The fourth factor could be established under the majority's holding but, predictably, the future dispute over the raising of taxes and political choices about the appropriation of revenues involves ongoing political discourse, which this court lacks power to affect or influence. Under any approach, the dispute is, at best, possible to recur in the future.

Whether the justiciability factors are thoroughly analyzed or the holdings of our prior cases are applied and followed, this case is nonjusticiable. The decision of the superior court should be reversed and the matter remanded with direction to dismiss.

No. 87425-5

No. 87425-5

J.M. JOHNSON, J. (dissenting)—Article II of our constitution, as modified

by Amendment 7 to authorize initiatives and referenda, requires action on the part

of the legislature or a direct vote of the people to resolve legislative political issues

such as taxation. The majority ironically overrides our constitution and prior case

law to enforce an invented policy concern: the fear that laws requiring a

supermajority to raise taxes permit a "tyranny of the minority." Majority at 20.

There is, of course, no historical evidence justifying such a concern in Washington.

With regard to taxation, the historical record in this state is to the contrary; taxes

often need a special vote of the people to qualify or pass. School levies and special

assessments for special purpose districts are only a few examples.[1]  *See, e.g.*,

CONST. art. VII, § 2(a) (excess levies require "three-fifths of the voters . . . [and/or]

---

[1] The United States Supreme Court's decision upholding the "supermajority" requirements is discussed *infra*.

1

the number of voters voting 'yes' on the proposition shall constitute three-fifths of a number equal to forty percent of the total number of voters voting in such taxing district at the last preceding general election . . . ."); *Gordon v. Lance*, 403 U.S. 1, 7, 91 S. Ct. 1889, 29 L. Ed. 2d 273 (1971) (upholding a supermajority requirement).

There is considerable irony in today's decision given the majority's claimed fear of tyrannical minority control. Through a single decision, a court of nine people (actually only six votes) is imposing their policy preference over that of the 1,575,655 voters who passed Initiative 1053 (I-1053) and the millions who qualified and passed similar tax protections.[2,3] I regretfully observe that this court has become the tyrannous minority it purports to guard against. This violation of

---

[2] I-1053 passed in 2010 with 1,575,655 (63.75%) votes for and 895,833 (36.25%) votes against. *November 02, 2010 General Election Results: Initiative Measure 1053 Concerning tax and fee increases imposed by state government*, WASHINGTON SECRETARY ST. (Nov. 29, 2010 9:49 AM), http://vote.wa.gov/results/20101102/Initiative-Measure-1053-Concerning-tax-and-fee-increases-imposed-by-state-government.html; *see also infra* App. A.

[3] This court is also imposing its agenda over that of the 1,892,969 voters who passed Initiative 1185 in 2012. *November 06, 2010 General Election Results: Initiative Measure 1185 Concerning tax and fee increases imposed by state government*, WASHINGTON SECRETARY ST. (Nov. 27, 2012 4:55 PM), http://vote.wa.gov/results/20121106/Initiative -Measure-No-1185-Concerns-tax-and-fee-increases-imposed-by-state-government.html. After its initial adoption in 1993, each time the supermajority requirement has been put before the voters it has passed by a higher percentage of the vote than the last time. *See infra* App. A.

our constitution can only detract from public respect for this court and its decisions. I therefore dissent.[4]

The majority opinion suffers from three obvious and grave infirmities. First, the majority's historical interpretation of the Washington Constitution and its separation of powers incorrectly place the court in a position of preeminence over the legislature and the people. Second, the majority's plain language reading of article II, section 22 is contrived and illogical. It will be repeatedly observed that our founders could have written article II, section 22 to read as follows: "Every bill attaining a simple majority shall become law." They choose not to and, as is further explained below, were aware of other states' constitutional provisions in existence at the time that more clearly establish a simple majority vote as a ceiling. Third, the majority's historical analysis of article II, section 22 ignores the only evidence this court has ruled admissible to show our framers' intent. This evidence conclusively establishes that the framers intended this section to create a quorum requirement for bill passage.

---

[4] I also join in senior Justice C. Johnson's dissent, which correctly analyzes the jurisdiction of this court and the many cases in which we have held partisan political matters are charged to the legislature, the elected governor, and the people, *not* to the courts.

This state's geographical size and the slow means of travel available at that time could enable legislators from areas closer to the capitol to meet and pass legislation before legislators could arrive from areas located far away. Snow-clogged mountain passes were likely a common source of this problem. Thus, adopting the simple majority language would not protect the citizens of this state living in remote areas. The framers had to adopt article II, section 22 as it is currently written in order to secure a quorum requirement and protect voters living in the far corners of our state. *See Proceedings of the Constitutional Convention*, SEATTLE TIMES, Aug. 9, 1889, at 1, *in* WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889: CONTEMPORARY NEWSPAPER ARTICLES (Marian Gallagher Law Library 1998) (further discussed *infra*).

## ANALYSIS

I.    The Washington State Constitution First and Foremost Serves to Protect Individual Rights and Private Property

Incredibly, this six-vote majority overrides the votes of an overwhelming majority of Washington voters out of an invented concern that laws like I-1053 could impose a "tyranny of the minority." Majority at 20. This policy concern is better directed at opposing a constitutional amendment that would establish a permanent two-thirds majority requirement than it is for a court decision

overturning an initiative that can be changed by the legislature or be periodically renewed by a majority of the voters.

In the *Federalist* papers, the founding fathers of our nation briefly addressed their desire to guard against minority control in a few specific policy areas. *See* THE FEDERALIST NO. 22, at 141-42 (Alexander Hamilton) (Jacob E. Cooke ed., 1961); THE FEDERALIST NO. 58, at 392 (James Madison) (Jacob E. Cooke ed., 1961). The majority's myopic reliance on this narrow concern, however, is unfounded.

First, historical accounts indicate that the framers of the Washington Constitution had goals and anxieties distinct from those of the framers of the United States Constitution. Above all, the Washington Constitution is predicated on the protection of individual rights, including those related to property, which is clearly affected by taxes. The framers declared the primacy of individual rights in their vision of the role of state government in the very first section of the constitution: "All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights." CONST. art. I, § 1. A key component of that protection is the direct influence on state government the constitution affords voters. Second, more so than any contrived "tyranny of the minority," the framers

5

sought to prevent corruption and special interests from controlling state government. Again, the framers and those who have drafted constitutional amendments 7 and 8 thought that this was best accomplished by allowing the voters to have more of a direct say in the management of their government, not less.

Washington's framers forged a distinct path predicated on mistrust of government and the primacy of individual rights. The citizens of Washington were not alone in these views toward government. The Washington Constitution was adopted during a period of national skepticism toward legislative bodies collectively referred to as "populis[m]." ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 50-51 (2002).

Even after the ratification of a constitution especially designed to limit government and promote individual rights, Washingtonians have felt the need to periodically reinforce popular control. Legislators (and courts) sometimes forget article I, section I: it is the citizens of this state that empower the legislature. The power is vested in the people. Consequently, in 1912, out of a concern that individual rights needed further protection from elected (and sometimes corrupt) officials, Washingtonians passed Amendment 7, which established the power of initiative and referendum. Passed concurrently, Amendment 8 allowed for the

recall of all elected officers except judges.[5] UTTER & SPITZER, *supra*, at 50. To this day, the powers of initiative, referendum, and recall vest in the people the ability to hold government accountable. The majority essentially contends that because our nation's founders expressed their concerns about minority control in a few areas of national concern, Washington's framers intended to keep Washington voters from limiting the power of the legislature to tax. Given Washington's unique reliance on popular governance, the majority's contention is unfounded.

Historical records reveal that the nation's founders' main fear was that some states could gain disproportionate power in Congress through bicameralism. *See* THE FEDERALIST NO. 58, at 392 (James Madison) (Jacob E. Cooke ed., 1961). In *Federalist* No. 22, quoted in the majority opinion, Alexander Hamilton expressed the additional concern that a minority of the states might be able to prevent the nation from making peace during wartime. THE FEDERALIST NO. 22, at 141-42 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). Fortunately, history has proved these concerns to be overstated. Indeed, this has never been a problem. Certainly, these particular national issues were irrelevant to the framers of our state constitution. Washington's framers did not have to consider national security or

---

[5] Raising one obvious and simple solution, if the people decide that their judges are disregarding their constitution, recall should apply to judges as well.

congressional decision making when designing Washington's government. Washington's framers instead faced more pressing local and personal issues relating to private property, individual rights, and corruption in government.

In fact, the prospect of a tyranny (or corruption) of the majority was a far more pressing concern for drafters of a state constitution. While the United States Constitution was created to grant limited and enumerated powers to the federal government, the Washington State Constitution was created to limit the broader, nearly plenary, police power of the state. UTTER & SPITZER, *supra*, at 2. In 1889, the framers were justifiably worried that a legislature would harm minority groups through abuse of its power. The historical record is replete with criticism in this vein. *See, e.g.*, Lebbeus J. Knapp, *The Origin of the Constitution of the State of Washington*, 4 WASH. HIST. Q. 227, 250 (1913) ("These restrictions on legislative action then, we may conclude, are indicative of the onward march of true democracy, for, of all oppressive and unjust instruments of government the legislature is the greatest and most irresponsible.") A supermajority requirement for the passage of legislation is a powerful tool for combating abuse by a short-term majority and addresses the concerns of the framers.[6]

---

[6] I feel compelled to again point out that it is a majority of the voters who have imposed this limitation on the legislature's power.

Furthermore, providing such protection against taxation is affirmed in express United States Supreme Court precedent. *See Gordon*, 403 U.S. at 7 (holding that state constitutional requirement of 60 percent of voters to approve bonded indebtedness and approve the tax increase to pay for the debt did not violate equal protection even though each vote who favored taxes would have a proportionately smaller impact on the outcome of the election than those opposed).[7]

In *Federalist* No. 10, James Madison directly noted that taxation is a tempting tool for a majority to use in its abuse of a minority:

> The apportionment of taxes on the various descriptions of property, is an act which seems to require the most exact impartiality; yet, there is perhaps no legislative act in which greater opportunity and temptation are given to a predominant party, to trample on the rules of justice. Every shilling with which they over-burden the inferior number, is a shilling saved to their own pockets.

THE FEDERALIST NO. 10, at 60 (James Madison) (Jacob E. Cooke ed., 1961). This idea was echoed by Chief Justice John Marshall when he penned the axiomatic words "the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431, 4 L. Ed. 579 (1819).

---

[7] I-1053's supermajority requirement is not without precedent at the federal level. United States Senate rules permit filibuster by allowing senators to speak as long as they wish unless a three-fifths vote closes the debate by invoking cloture. Standing Rules of the Senate Rule XXII, § 2.

9

The majority correctly notes that Washington's framers were familiar with supermajority requirements and specifically employed their use seven times in the constitution. *See* majority at 16 n.7. Absolutely no evidence exists, however, to suggest that the framers intended those uses to be exclusive. There is certainly no constitutional provision to that effect.

In *Federalist* No. 51, James Madison wrote, "In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to controul the governed; and in the next place, oblige it to controul itself." THE FEDERALIST NO. 51, at 349 (James Madison) (Jacob E. Cooke ed., 1961). Through the initiative process, the voters of this state placed a limitation on the legislature's power to tax, which fully accords with our state constitution. This court's interference today unlawfully invalidates a legitimate action of the people of this state under the initiative power. *See* CONST. art. II, § 1 ("[T]he people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section, or part of any bill, act, or law passed by the legislature.")

## II.    The Plain Language of Article II, Section 22 Allows the People to Institute Supermajority Requirements Through Initiative

The majority would rewrite the plain language of article II, section 22 to mean that "any bill receiving a simple majority vote will become law." Majority at 13-14. This reading defies logic and assumes the framers were incapable of expressing themselves clearly.

Article II, section 22 reads, "No bill shall become a law unless . . . a majority of the members elected to each house be recorded thereon as voting in its favor." CONST. art. II, § 22. This section establishes the principle that any vote less than a majority is not enough to pass a bill. Put another way, this language describes the circumstances under which a bill does *not* pass. The likely frequent problem of delay in arriving from across the state for the legislative sessions was anticipated. Snow-blocked passes were common, travel was hard and slow, and the likely impact fell directly on legislators from eastern Washington.

Had the framers wished to require only a simple majority vote for passage, they could have worded the section to accomplish this. Wording as simple as "Every bill attaining a simple majority shall become a law" would have sufficed. In fact, the framers could have modeled such a simple provision after a number of other states' constitutions in existence at that time. Notably, Washington's framers drew from the Indiana Constitution, which contains a provision much more akin to

11

a voting floor and ceiling than does our constitution. *See* Arthur S. Beardsley, *Sources of the Washington State Constitution, in* 2011-2012 LEGISLATIVE MANUAL 386. Article IV, section 25 of Indiana's 1851 constitution reads: "A majority of all the members elected to each House, shall be necessary to pass every bill or joint resolution; and all bills and joint resolutions so passed, shall be signed by the Presiding Officers of the respective Houses." This language has not been amended and remains in Indiana's constitution today.

Indiana's article IV, section 25 stands in stark contrast to Washington's article II, sections 22 and 32, which read, "No bill shall become a law unless . . . a majority of the members elected to each house be recorded thereon as voting in its favor [and] [n]o bill shall become a law until the same shall have been signed by the presiding officer of each of the two houses." CONST. art. II, §§ 22, 32.[8] Washington's language, worded in the negative, describes only the circumstances under which a bill will *not* become a law. These include not gaining a majority vote and not being signed by the presiding officers. In contrast, Indiana's positively worded provision provides that all bills gaining a majority *shall* be signed by the presiding officers. Having derived 7 sections directly from the

---

[8] It is not clear how the court's majority deals with abstention in a close vote.

Indiana Constitution and creating 10 others with marked similarities, the Washington framers could have written a positively worded provision similar to Indiana's article IV, section 25. *See* Beardsley, *supra,* at 387. They did not by choice. We must presume that the words were deliberately chosen by the framers to effectuate their desired goals. The voters read and ratified what was written.

Importantly, the majority makes another logical error in order to reach their rewrite of article II, section 22. They explain, "In other words, if a bill has become law, then it must have been supported by a simple majority vote." Majority at 14. The next sentence reads, "Under a commonsense understanding, any bill receiving a simple majority vote will become law." *Id.* These two sentences present a textbook example of a logical fallacy: they confuse necessary and sufficient conditions. The majority is correct, a simple majority is necessary for the passage of a bill. However, the majority is wrong when it contends that just because a simple majority is necessary, it is also always sufficient. The majority has obviously forgotten abstentions or "present" votes. Furthermore, the confusion of necessary and sufficient conditions defies basic rules of logic and provides support for the majority to misinterpret the plain language of article II, section 22 as written by its founders and ratified by the state. *See* majority at 14.

13

The legislature has itself relied upon the plain language of article II, section 22 to affirm supermajority requirements and has specifically done so with regard to taxes. For example, Initiative 601 (I-601), originally enacted in 1993, which created a two-thirds supermajority requirement for raising taxes, was codified at chapter 43.135 RCW (the Taxpayer Protection Act or TPA). *See Brown v. Owen*, 165 Wn.2d 706, 712, 206 P.3d 310 (2009). Since then, "'[t]he TPA has been revised, amended, and reenacted many times.'" *Id.* at 713 (quoting *Wash. State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 292, 174 P.3d 1142 (2007)). The legislature "reenacted and reaffirmed" Initiative 601 (I-601) in 1998. LAWS OF 1998, ch. 321, § 14. The legislature later strengthened portions of the TPA, again reenacting and reaffirming it before finally temporarily suspending some of its requirements. *Brown*, 165 Wn.2d at 713. The majority's holding today implies that the history of the TPA shows frequent unconstitutional legislative action. Unlike the majority, I presume that the legislators have acted in accordance with their oaths of office to uphold the state constitution. Given the plain language of article II, section 22, I am confident in this conclusion.

III. <u>The History Surrounding Article II, Section 22 Shows that the Section Simply Establishes a Quorum Requirement</u>

The majority opinion disregards historical evidence that clearly establishes that the framers intended to create a quorum requirement, not prospectively

14

prevent supermajority requirements. *See Proceedings of the Constitutional Convention*, SEATTLE TIMES, Aug. 9, 1889, at 1. The proceedings of Washington's constitutional convention were recorded. The members of the convention recorded summaries of motions and votes in the "Minutes of Proceedings." Court reporters did take shorthand notes but no appropriation covered the cost of transcribing the shorthand notes and they were destroyed. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889: WITH ANALYTICAL INDEX, at vi-vii (Beverly Paulik Rosenow ed., 1999).

We have previously recognized, in the absence of transcripts, we must rely on the proceedings of the convention as recorded in newspaper articles published at the time. Fortunately, these articles remain as an important tool to ascertain the intent of the framers. *See Witters v. Comm'n for the Blind*, 112 Wn.2d 363, 385, 771 P.2d 1119 (1989) ("[T]his court has used contemporary newspapers' accounts of the state constitutional convention to supplement the official minutes since no verbatim record of the convention exists." (citing *Yelle v. Bishop*, 55 Wn.2d 286, 293, 347 P.2d 1081 (1959))).

The minutes of the convention indicate that there were two relevant motions concerning article II, section 22:

> Motion:  Turner moved that the words "majority vote" be [ ] stricken.

| Action: | Motion lost. |
| Motion: | Power moved to insert a provision that a majority of those present could pass a bill. |
| Action: | Motion lost. |

THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, *supra*, at 536. These motions and rulings were published in both the *Seattle Times* and the *Tacoma Ledger*.

The *Seattle Times* article from August 9, 1889, describes the first motion: "Turner moved to strike out the provision that a majority vote of the members elected be necessary to pass a bill. The motion was lost and the section passed." *Proceedings of the Constitutional Convention*, SEATTLE TIMES, Aug. 9, 1889, at 1. This article provides a key piece of information that is otherwise left out of the minutes: namely, that the debate surrounding article II, section 22 was whether the majority *of the members elected* could pass a bill, as opposed to simply the majority of members *present*.

This is further supported by the second motion, to insert a provision that a majority of those *present* could pass a bill. This motion also failed, and the article II, section 22 controlling today was enacted. When read in this light, article II, section 22 is clearly and unequivocally a quorum requirement.

That article II, section 22 is a quorum requirement is understandable given the historical context within which the framers were operating. As I noted before,

in 1889, the state was still relatively undeveloped, rendering travel difficult and unexpected delays not uncommon—storm- or snow-closed passes have been noted *supra*. The framers did not want legislators from areas closer to the capitol to be able to pass legislation in the absence of legislators traveling from areas farther away. Because the debate surrounding article II, section 22 related to a quorum requirement, no evidence exists to support the majority's conclusion that the framers intended to prevent the institution of a supermajority requirement.

CONCLUSION

The majority disregards the importance of individual rights as the centerpiece for the state constitution and our populist roots; illogically construes the plain language of article II, section 22; and fails to consider historical evidence that establishes that the provision simply sets out a quorum requirement. The supermajority requirement created by I-1053 in no way violates our state constitution.

If the history of this great state can teach us anything, it is this: the power of the people will prevail. If the legislature passes a tax the people oppose, the people will find a way to repeal it. That "way" may include throwing out legislators or using other article II remedies. In an even more commanding exercise of their power, the people may choose to enact a constitutional amendment requiring a

supermajority to pass taxes. The changes in the way our state values property and limits levies followed a similar history. Consistent with the spirit and history of our Washington Constitution, I am sure democracy will carry the day; the voters will not be denied their rights.

The framers of our constitution, and the electors who ratified it and then added the initiative and referendum as additional ways for the people to control the legislature, would be appalled by this court's blatant rewrite of our constitution. I agree with our framers and the voters who ratified article II, section 22, and therefore dissent.[9]

---

[9] I also vehemently agree with Justice C. Johnson's scholarly jurisdictional and historical analysis opposing the majority and have signed that opinion.

Appendix A

Washington State Supermajority Initiative Statistics

| Initiative | Year | Votes for | Votes against | Pass or Fail |
|---|---|---|---|---|
| I-1185 [10] | 2012 | 1,892,969 (63.91%) | 1,069,083 (36.09%) | Pass |
| I-1053 [11] | 2010 | 1,575,655 (63.75%) | 895,833 (36.25%) | Pass |
| I-960 [12] | 2007 | 816,792 (51.24%) | 777,125 (48.76%) | Pass |
| I-601 [13] | 1993 | 774,342 (51.21%) | 737,735 (48.79%) | Pass |

[10] *November 02, 2010 General Election Results: Initiative Measure 1053 Concerning tax and fee increases imposed by state government*, WASHINGTON SECRETARY ST. (Nov. 29, 2010 9:49 AM), http://vote.wa.gov/results/20101102/Initiative-Measure-1053-Concerning-tax-and-fee-increases-imposed-by-state-government.html.

[11] *November 06, 2010 General Election Results: Initiative Measure 1185 Concerning tax and fee increases imposed by state government*, WASHINGTON SECRETARY ST. (Nov. 27, 2012 4:55 PM), http://vote.wa.gov/results/20121106/Initiative -Measure-No-1185-Concerns-tax-and-fee-increases-imposed-by-state-government.html.

[12] *November 06, 2007 General Election Results: Initiative Measure 960 Concerns tax and fee increases imposed by state government*, WASHINGTON SECRETARY ST. (NOV. 29, 2007 4:08 PM), http://vote.wa.gov/results/20071106/Initiative-Measure-960-concerns-tax-and-fee-increases-imposed-by-state-government.html.

[13] *November 1993 General*, WASHINGTON SECRETARY ST., http://www.sos.wa.gov/elections/results_report.aspx?e=22&c=&c2=&t=&t2=5&p=&p2=&y= (last visited Feb. 25, 2013).